IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| THE HILLMAN GROUP, INC., | : | Case No. 1:13-cv-00707 |
| | : | |
| Plaintiff, | : | Judge Susan J. Dlott |
| | : | |
| v. | : | **ORDER DENYING** |
| | : | **DEFENDANT'S MOTION FOR** |
| MINUTE KEY INC., | : | **SUMMARY JUDGMENT** |
| | : | |
| Defendant. | : | |
| | : | |

This matter is before the Court on Defendant Minute Key Inc.'s Motion for Summary

Judgment (Docs. 118 (SEALED)/119). Plaintiff has filed a response in opposition (Doc. 129), to

which Defendant has replied (Doc. 130).[1] For the reasons that follow, Defendant's Motion will

be DENIED.

## I.    BACKGROUND

### A.  Facts[2]

#### 1.    <u>An industry evolves.</u>

Plaintiff The Hillman Group, Inc. ("Hillman") is, among other things, in the business of

key duplication. It is a wholly owned subsidiary of The Hillman Companies, Inc., which

describes its "Keys and Key Accessories" industry in part as follows:

> Hillman designs and manufactures proprietary equipment which forms the
> cornerstone for the Company's key duplication business. The Hillman key
> duplication system is offered in various retail channels including mass

---

[1] The Court denied Plaintiff's motion for leave to file a surreply. (*See* Docs. 131, 132, 133).
[2] Typically background facts would be drawn from Defendant's Proposed Undisputed Facts to the extent those facts
are admitted in Plaintiff's response thereto, and where the parties do not expressly agree, the Court would cite to that
portion of the record providing support for the statement. Regrettably, the divide between the parties here is so
entrenched that they agree on virtually nothing. The Court has done its best to wade through the voluminous and
duplicative exhibits filed by the parties and construct a neutral, comprehensive chronology of events.

merchants, home centers, automotive parts retailers, franchise and independent ("F&I") hardware stores, and grocery/drug chains; it can also be found in many service-based businesses like parcel shipping outlets.

Hillman markets multiple separate key duplication systems. . . .

(Doc. 119-5, The Hillman Cos., Inc., Annual Report (Form 10-K) (Mar. 27, 2015) at PageID 4024.)

Traditionally, key duplication has been a manual process. A customer travels to a retailer and hands a key to an associate, often one assigned to the hardware or automotive department. That associate, in turn, identifies the proper key blank from the retailer's inventory and then cuts a duplicate on equipment that only the associate can operate. (*See* Doc. 114, Yancey Dep. at PageID 3081 (86:7-87:25).) Hillman is the "industry leader" in this process, owning a hefty 60% of the national market. (*See* Doc. 112, Seeds Dep. at PageID 2889 (41:1-25).)

Self-service, automatic key duplication, however, is a new trend. Kiosks are located "post-register," meaning right inside the front wall of the store near the entrance. (*Id.* at PageID 2907 (111:11-24).) Both customer and retailer can benefit. (Doc. 119-3 at PageID 3991.) The customer need not find an associate, but can duplicate his or her own key without any assistance. (*See* Doc. 112, Seeds Dep. at PageID 2907 (110:4-5).) The retailer regains the floor space once occupied by the manual key duplication equipment, and its associates can focus their attention toward sales of bigger ticket items. (Doc. 119-3 at PageID 3391.) In addition, because kiosks are restocked as necessary by the vendor, the retailer no longer need purchase a large inventory of key blanks. (*See id.*; Doc. 114, Yancey Dep. at PageID 3069 (39:13-23), 3074 (61:7-21).)

Defendant Minute Key Inc. ("Minute Key") developed and eventually patented just such a kiosk. (Doc. 58-1, Network of Fully Automatic Self-Service Key Duplicating Kiosks, U.S. Patent No. 8,532,809 B2 (filed Jan. 16, 2013) (issued Sept. 10, 2013) ("the '809 Patent") at

PageID 1089–1160.)  And it has sought to displace Hillman—which markets its own kiosk known as FastKey—as the established industry leader in key duplication, at least in the self-service arena.

Minute Key CEO Randy Fagundo first met with Walmart in the summer of 2010.  (Doc. 103, Fagundo Dep. at PageID 2338 (103:24-25).)  Some six months later, Minute Key began to place kiosks—19 in total—in various Walmart stores across the country on a trial basis.  (*Id.* at PageID 2338 (131:2-7); Doc. 129-31 at PageID 7251.)  Fagundo testified that, in January 2012, Minute Key "signed a contract [with Walmart] for a national rollout for roughly 1,000 to 1600 stores that we would install in 2012."  (Doc. 103, Fagundo Dep. at PageID 2338 (131:7-9).)[3]  To this end, Minute Key commenced negotiations with Guggenheim Corporate Funding, LLC ("Guggenheim") to "finance the rollout."  (*Id.* at PageID 2338 (131:13-14); Doc. 129-34 at PageID 7298–7301.)  According to Fagundo, as part of its due diligence Guggenheim contacted Shawn Jones (Director of Leasing Operations) at Walmart in March or April of 2012.  (Doc. 103, Fagundo Dep. at PageID 2338 (131:14-132:2).)  Jones apparently advised Guggenheim that the rollout would be delayed and the pilot extended.  (*Id.* at PageID 2338 (131:24-132:7; 133:1-11).)  Guggenheim relayed this information to Fagundo, who responded, "That's news to me." (*Id.* at PageID 2338 (133:1-11).)

Fagundo promptly travelled to Walmart's headquarters in Bentonville, Arkansas to meet in person with Leigh Tedford (Senior Manager, Automated Consumer Services ("ACS")) and Christy Rains (Manager, ACS and Minute Key liaison).  (*Id.* at PageID 2338 (133:11-25)–2339 (134:1, 135:10-19).)  There he was told that Minute Key would have to compete against Hillman

---

[3] Fagundo clarified that Minute Key received a "verbal" commitment from Walmart as to the 1000+ number of stores involved in the rollout.  (Doc. 103, Fagundo Dep. at PageID 2338 (131:21-132:22); Doc. 109, Jones Dep. at PageID 2641 (11:4-9).)  Review of the Vending Agreement that bears Fagundo's signature lists (in Exhibit C) only the 19 trial locations plus five additional Neighborhood Markets.  (*Cf.* Doc. 129-31 at PageID 7251 *with* Doc. 129-32 at PageID 7272.)

in the form of a 100-store to 100-store, head-to-head pilot over the next three to six months. (*Id.* at PageID 2339 (135:20-136:1).) Fagundo believed that Hillman's "very good relationship" with Walmart's Tire Lube Express ("TLE") team was at the root of the decision to extend the pilot and, in turn, delay Minute Key's national rollout. (*Id.* at PageID 2339 (136:1-137:16).) He also conceded that this decision to renege "practically put minuteKEY out of business." (*Id.* at PageID 2371 (262:11-13).)

The criteria for the pilot competition were set forth in an April 5, 2012 email from Tedford to both Hillman and Minute Key. (Doc. 129-35, 2012/2013 Walmart Key Cutting Strategy Plans at PageID 7303; Doc. 103, Fagundo Dep. at PageID 2340 (139:14-25).) It would run for at least six months—and possibly up to one year—from approximately September 2012 through April 2013. (Doc. 129-35 at PageID 7303.) During the pilot phase, "all sales, traffic commissions, marketing initiative, etc w[ould] be tracked and reported weekly to the Walmart ACS team and the TLE Team." (*Id.*) Walmart defined its "goal" as an exercise to monitor whether kiosk key sales (in the front of the store) could serve to increase sales of transponder keys[4] from the TLE department (in the back of the store). (*Id.*; Doc. 103, Fagundo Dep. at PageID 2342 (149:23-25)–2343 (150:1-2), 2357 (207:22-208:9).)

Regarding the head-to-head pilot with Hillman, Minute Key board member and investor Kevin Frick sent this email to Randy Fagundo:

> Thanks again for the update today on Walmart. Not the answer we were expecting, but that's the way it goes sometimes. I know you guys are going to be all over this, but I wanted to throw out a few items as food for thought. I'm not sure there is anything insightful here, but I also think **this is going to be a pretty defining event in the company's path forward**.

---

[4] In simple terms, a transponder key is an automobile key with an electronic chip inside that enables an engine to start. (*See* Doc. 116, Hoelter Dep. at PageID 3260 (105:22-25).) A transponder key cannot be duplicated at a self-service kiosk. (*Id.* at PageID 3261 (106:4-8).)

4

First, getting the rules defined (on paper) going into this is critical.  **I suspect Hillman will be pulling out all the stops from a relationship front, and there is some risk that even if we beat them that they could pull the relationship lever if we don't beat them by enough.**  However, I think this is more difficult for them to do that if the rules are clearly established upfront.  Of course, we should try to define the rules as much as we can to our benefit (in timing, store selection, metrics, etc.), but simply getting the rules as clear as possibly [sic] will serve our purpose.

. . .

**Finally, I wonder if there is any way we can use the patent applications to create some FUD[5] with Walmart re Hillman**.  It would be a shame for them to waste a lot of time and money running a pilot with a machine that is in violation of several patents.  Rolling something out could mean even more egg on someone's face.

In any case, we have time to plan for this, but **this is about as critical as it gets**, so I'd love to make sure we are spending cycles on this in the coming months.

(Doc. 129-6 at PageID 6966–6967 (emphasis added); *see* Doc. 103, Fagundo Dep. at PageID 2343 (152:18-20).)  Fagundo forwarded Frick's email to Chris Lohmann with the message, "Some **good thoughts from Kevin** and a a fee [sic] things **we should cover in the deck**.  We can discuss today."  (Doc. 129-6 at PageID 6966 (emphasis added).)

## 2. <u>And the winner is?</u>

On December 4, 2012, Randy Fagundo learned that Hillman won the pilot.  An email from April Crawford (Manager, ACS and Minute Key liaison) to Shawn Jones and Leigh Tedford indicated that ACS would commit 900 stores to Hillman and 300 to Minute Key.[6]  (Doc. 129-24 at PageID 7116–7118.)  Fagundo responded as follows:

Shawn, Noticed in the email that **Hillman received 900 stores vs. Minutekey 300**.  No sour grapes here, we appreciate the opportunity, but in every retailer where we have gone head to head with fastkey @ Lowes, Menards, Meijer,

---

[5] Fagundo testified that "FUD" is an acronym for "fear, uncertainty and doubt."  (Doc. 103, Fagundo Dep. at PageID 2343 (153:14-24).)
[6] Even though the pilot was pitched as a winner-take-all affair, Jones testified that Walmart awarded Minute Key a small number of stores in an effort to compensate Minute Key for the capital expenditures it incurred, otherwise referred to as "CAPEX."  (Doc. 109, Jones Dep. at PageID 2647 (34:19-36:6), 2669 (124:19-22).)

> Orchard Supply Hardware; our machine has won in every category; revenue, reliability, customer experience and accuracy.  Is there anything we can do here to improve our position?  Any feedback would be greatly appreciated.  Do you have any time to talk in the next couple of days?

(Doc. 129-24 at PageID 7116 (emphasis added).)  Fagundo and Jones did speak, with Fagundo summarizing his conversation in an email to Kevin Frick, Dana Stalder (another investor) and Minute Key co-founder and board chair Ari Freeman:

> I spoke with Shawn this morning and **when I pressed Shawn on why the list was tilted towards Hillman he said the Transponder key program in the automotive dept is important for the automotive group and Hillman leveraged the program to their advantage.**  I believe the stores on their list are stores where they sell Hillman's transponder keys in the automotive dept.  The program is not in every store.
>
> I spoke to another contact, Rod Liston, who works in the department but was not involved in this process and **he said the Hillman relationship with the automotive group is quite strong** and although they have a longer list of stores to survey, at the end of the day the better program will ultimately gain the deepest distribution.  Hillman was pressing very hard for us to receive no distribution but due to our performance in the pilot they were not able to shut us out.

(*Id.* (emphasis added).)  Frick characterized the result as a "punch in the gut."  (*Id.* at PageID 7113.)  He also questioned whether it was time for Minute Key to consider "how/whether to use our patents **to play offense**."  (*Id.* (emphasis added).)

Minute Key began to survey stores on its list.  A visit to a Walmart store in Cincinnati launched the ensuing series of emails.  Rob Kaslon, Minute Key's Director of Deployment Operations, to Randy Fagundo on January 9, 2013:

> Chris [Levine] was surveying a store in Cinncinatti [sic] that was assigned to us and found a Hillman machine in the front of the store.
>
> We were wondering if you would be interested in sharing this with Shawn @ WM to discuss how he would like to handle?  We have ranked this store as "very good" and we would like to have it if possible.  I wonder if there are other stores that Hillman is in?

6

(Doc. 129-45 at PageID 7448.) Five more emails were exchanged in-house in this regard on that

date. From Fagundo:

> Forwarded Chris' email with photo to Shawn. Got an out of Office Response.
> Lohmann, Will you ask Jessie what happened here? I think we should ask for the
> store. Levine, Did you speak with store manager. If not you should approach him
> with the list and letter and ask for a location.

(*Id.*) From Chris Levine:

> **I like when you get feisty and mean.** I knew the outcome of that one and saw
> Seans [sic] response.
> Going to several Meijers tomorrow.

(*Id.* at PageID 7447.) From Fagundo:

> **Fuck Hillman, they don't know they are messing with a pirate.**

(*Id.* (emphasis added).) Again from Levine:

> Ha. . .love it. Always need a competitor and **we will whack them in time**

(*Id*. (emphasis added).) From Fagundo:

> **Need to whack them now!**

(*Id.* (emphasis added).)

On January 11, 2013, Walmart's April Crawford sent a revised list of 299 stores to

Minute Key's Chris Lohmann "to scope for possible placement." (Doc. 129-44 at PageID 7443–

7444.) It was revised in the sense that Walmart removed "any stores [from the previous list] that

already had a fast key machine." (*Id.*) On January 14, 2013, Dan Peck, Minute Key's Vice

President of Operations and Supply Chain, memorialized his assumption that Hillman "got first

cut at this[]" and noted that the "new" list contained "only two of Wal-marts top 500 key-cutting

stores[]." (*Id.* at PageID 7442.) Fagundo forwarded Peck's email not only to Shawn Jones, but

also to Gary Withrow (Senior Director, ACS), along with his own message:

> Shawn and Gary, Please see the email below. Did we not perform well in the pilot? In every other head to head competition with the Fast Key machine our machine out performed Fast Key and we were awarded the roll out. Seems like that is not the case here. Can you help me understand where we missed with you? Your business is very important to us and we want to make sure we are doing everything we can to win your business.

(Doc. 129-37 at PageID 7308.) Jones replied:

> As we discussed at your office [i]n Denver **the real difference or outlier is with your competition offering the transponder keys and driving traffic back to TLE**.

(*Id.* (emphasis added).)[7] In-house to Peck, Lohmann, Levine, Kaslon and Chris Gerd, Fagundo wrote:

> Something doesn't feel right here and we will keep pushing here. Our program is much better than theirs and it's not like WalMart to not recognize the difference.

(Doc. 129-44 at PageID 7440.) Early the next morning, January 15, Fagundo emailed Kevin Frick about potentially securing business from The Home Depot, and included the following remark concerning Walmart: "Also heading to Bentonville to discuss the store assignments next week. **Thinking about raising the patent card**." (Doc. 129-11 at PageID 7056–7057.) Frick answered:

> Sounds good – good luck in Bentonville. On whether to mention the patents, the only downside I see is that it will get back to Hillman quickly and may stir action on their part before we can take action on ours. Not sure what that is, or whether we care, but will give it some thought. It could be a good thing that Hillman's [sic] starts to understand that they are about to invest $10M on some machines that will be in violation of our patents.

(*Id.* at PageID 7056.) Frick followed-up the next day, January 16, 2013:

> I'm comfortable with it. I'll leave it to your discretion, but one way to do it is to share some "good news' we just received from our patent filing …

---

[7] Jones testified that his role in judging the winner of the pilot to be "minimal." (Doc. 109, Jones Dep. at PageID 2646 (32:2).) "My team managed it." (*Id.*) He also testified that Walmart's Business Initiatives Committee had ultimate decision-making authority with respect to the "partner of choice" moving forward. (*Id.* at PageID 2647 (35:7-23), 2669 (123:14-24).)

(*Id.* at PageID 7055.)

Also on January 16, 2013, Chris Lohmann reached out to Minute Key's liaison at

Walmart, Christy Rains, who was about to return from a 90-day maternity leave:

> April and Jesse [Danielson] were good to work with – but I can't tell you how
> happy we are that you are back!  Give you the quick low-down on the past few
> weeks.
>
> 1. Got our store list – 399 stores
> 2. Got an email (not sure if we were suppose [sic] to see it) that showed Hillman
>    got a 900 store list
> 3. Started to survey stores and found Hillman was already in one of the stores.
>    Subsequently found out that 100 stores on our list were already given to
>    Hillman, so we have to summit [sic] a new list of 100 stores to survey.  And
>    of course most of the stores we surveyed since January were the 100 stores
>    that were pulled.
>
> So, we are meeting with Shawn and Gary.  Randy, actually all of us, really just
> want to know what happened and how we lost the test.  The test results were not
> shared with us – so we really want to understand why Hillman got 900 top
> performing stores and we got a second tier 300 stores.  We have beaten Fast Key
> at head-to-head contests at Lowes, OSH, Menards and Meijer – so we are hoping
> a meeting will shed some light on the results, the situation and the opportunity
> moving forward.  Any suggestions / ideas what we should ask them?

(Doc. 129-38 at PageID 7312.)  So, too, did Fagundo:

> Christy, Thrilled to see you are back.  We really missed you.  Leigh's departure
> was disappointing and we were sad to see here [sic] leave.
>
> We are coming to Bentonville next week to meet and [sic] Shawn, Gary and
> hopefully you too.  Trying to understand why we were beaten by Hillman and
> what we need to do improve [sic] our store count.  We have won every other head
> to head competition we have had with Fast Key.

(Doc. 129-39 at PageID 7315.)

Fagundo summarized the meeting in an email sent to Minute Key employees and board

members on January 25, 2013:

> Attached is the deck we presented to WalMart yesterday.  We met with Gary
> Withrow, Sr Director of Automated Consumer Services, someone I have known
> and worked with for over 10 years.  He acknowledged that up until last week,

when I requested the meeting, he has not been engaged in the automated key cutting pilot. It seems like this was first time anyone really looked at the pilot results closely. As I shared before, the dept is in transition and people are distracted and concerned about their future roles at the company. One of our primary contacts, and an advocate has been out on maternity leave for 12 weeks and her manager left the dept in Dec. The meeting and our deck was timely and did a great job laying out the MK/Walmart story for Gary.

The good news, the store lists they provided in November are not final. They have implemented a new process that requires senior management approval for any and all fixture changes made in the stores and automated key cutting needs to go through the process. Gary is confident WalMart will be in the automated key cutting business the question is do they split the business or go with one vendor. They feel there may be national marketing advantages by having a single vendor.

They also shared that Hillman is already in the stores weekly and TLE thinks this would be an advantage to WMT because Hillman can provide better service in other categories they service in WMT. Weak argument.

**The only metric where we are lagging Hillman is transponder key sales in TLE. We need to redouble our efforts to impact transponder sales in the 41 stores where we are installed that sell transponder keys.**

We will meet this afternoon to discuss our plan. We are not out of the game here and I believe we are well positioned to be successful.

(Doc. 129-8 at PageID 6992–6993 (emphasis added).) Ari Freeman responded, "Does it feel like WM is prepping us for loss? By him saying that TLE sees advantages for going with one vendor and that we lose on transponder sales." (*Id.* at PageID 6992.) At Fagundo's request, Chris Lohmann weighed in:

Gary didn't say TLE saw advantages of going with one vendor – he said, he thought it might make sense to go with one vendor to leverage marketing support (circulars etc.). When Gary said it - April immediately piped in that Walmart has 4,000 stores so there was plenty of stores to have two vendors. Although I don't know, I believe April was worried that if Gary recommended a one vendor solution it would minute KEY.

As we have discussed, **I think we are winning on revenue, experience, relevancy, marketing, sustainability – all the metrics except one transponder keys sales**. However, an increase of just two transponder sales a week would make up the revenue cannibalization of 50 house keys for TLE, so I don't want to discount the importance of driving transponder sales on [sic] the next two weeks.

10

(*Id.* at PageID 6991 (emphasis added).)  Freeman replied:

> Seeing that we might have a limited time to act with WM…
> **We might want to send WM excerpts from latest findings from the patent office.  Such as our independent claims meet the criteria for patentability;** Novelty, Inventive step and Industrial application (see excerpt below).  These claims are describe [sic] a key machine kiosk that has network connectivity.  **We might want to just say something like…if our patents are issues [sic], and all indications show they will be, this effectively means Hillman (or another competitor) would not be able to have real time credit card transactions, sales reports, remote management or diagnosis.  All things kiosk companies need to succeed.**

(*Id.* (emphasis added).)

The deck presented to Walmart during the January 24, 2013 Business Review included a slide with the topic "Patents and Patents Pending."  (Doc. 129-7 at PageID 6986.)  So, too, did the decks presented on May 16, 2013 (Doc. 129-9 at PageID 7021) and on July 16, 2013 (Doc. 129-10 at PageID 7052).[8]

On June 6, 2013, and after a 15½ year-tenure, Shawn Jones left Walmart's employ to work for Hillman, accepting the position of Director of National Accounts.  (Doc. 109 at PageID 2655 (69:19-24); Doc. 119-45 at PageID 4351–4352.)  Negotiations had begun nine months earlier, in September 2012.  (Doc. 119-44, Email from Terry Rowe to Mick Hillman at PageID 4349 ("I told him our time frame may be significantly slower than his and he had no issues with that.  (His challenge is slowing his wife down.).")[9]  Upon Jones' departure, Dan Hoelter—Senior Manager for Home Services—assumed responsibility for all kiosks in the front of the store, including those devoted to self-service key duplication.  (Doc. 116, Hoelter Dep. at PageID 3237 (12:5-24).)  He testified, "When I did come on board I actually did a pretty thorough analysis of

---

[8] In contrast, the deck presented during the September 6, 2012 Quarterly Review makes no mention of patents or patents pending.  (*See* Doc. 129-43 at PageID 7395–7438.)

[9] Hillman's headquarters are located in Cincinnati.  (Doc. 119-5 at PageID 4019.)  Jones' wife is from the Cincinnati area, where her family remains, making this employment relationship ideal.  (Doc. 109, Jones Dep. at PageID 2656 (70:10-73:18).)  Jones testified, "If momma's happy, everybody's happy."  (*Id.* at PageID 2656 (73:17-18).)

both parties, both systems, in order to come to my own conclusion." (*Id.* at PageID 3240 (25:7-10).) Hoelter was not aware of the criteria considered originally during the pilot. (*Id.* at PageID 3240 (25:22-24).) In his view, however, the four most important categories, or key performance indicators ("KPIs"), were revenue per square foot, downtime, returns, and customer experience. (*Id.* at PageID 3238 (15:12-19), 3240 (25:11-16).) Looking at the data from the previous 12 months, Hoelter concluded that Minute Key, rather than Hillman, should have won. (*Id.* at PageID 3240 (25:17-20), 3241 (262-4).) He explained:

> In terms of profit per square foot, [Minute Key] was 25 percent more per machine per store. The customer experience was a little over a minute compared to between a little over three minutes. The downtime was a fracture [sic] of what the Hillman machine was. And the returns was [sic] significantly less, which all factor into customer experience.

(*Id.* at PageID 3241 (26:6-12).) In short, in each of the KPIs he thought critical, Minute Key outperformed Hillman. (*Id.* at PageID 3241 (26:20-23).) Accordingly, Hoelter approached his superior, Anne Johnson, Director of Home Services, to ask whether Hillman's 1000-store rollout of FastKey kiosks could be stopped. (*Id.* at PageID 3241 (26:24-27:27).) Johnson responded that it would be necessary for Walmart to honor its commitment and three-year contract (including a one-plus-one automatic renewal unless informed) with Hillman. (*Id.* at PageID 27:11-22).) Nonetheless, Hoelter understood Johnson to be "in alignment with expanding [Walmart's] operations with minuteKEY." (*Id.* at PageID 3242 (31:13-19).) In connection with putting together a forward annual operating plan, on July 25, 2013 he emailed Chris Lohmann— as Minute Key's Senior Vice President of Sales and Marketing—writing, "Let's look at the projection for a total of 1400 stores by the end of FYE15. I want to make sure we get you guys up to where you should be." (Doc. 119-47 at PageID 4358.) That figure represented an extra 1,000 stores added to the 400 awarded vis-à-vis the pilot competition against Hillman. (Doc.

116, Hoelter Dep. at PageID 3244 (38:4-8).) Regarding this opportunity, Lohmann remarked to board member Ari Freeman, "If we can turn back Fast Key at Walmart – they really will be out of major distribution channels – should make mK more attractive to Hillman." (Doc. 119-47 at PageID 4357.)

### 3. The '809 Patent.

The '809 Patent was filed on January 16, 2013, some six weeks after Randy Fagundo learned that Hillman won the pilot competition. (*See* Doc. 129-46 at PageID 7451–7453.) Minute Key requested and received a "Prioritized Examination" of its patent application, paying an additional fee of $2,400. (*See id.* at PageID 7452; Doc. 129-47.) On September 5, 2013, Fagundo emailed Walmart's Anne Johnson and Dan Hoelter:

> Per our conversation yesterday **I wanted to confirm with you that will [sic] be sending Hillman a patent infringement notice next Tuesday when our patent, U.S. Patent NO. 8,532,809 is issued. More specifically, It appears that The Hillman group's "FastKey" key-duplicating kiosk system infringes at least claims 1, 3, 5-7, 9 11-12 and 17. of our patent.** MinuteKey has clearly been the innovator in introducing networks of self-service key-duplicating kiosks, and MinuteKey's contributions would not have been possible without the investment of significant amounts of both time and money by our shareholders, to invent and develop this technology. Our investment is only protected by our intellectual property, and thus **we have no choice but to enforce our intellectual property against anyone who attempts to misappropriate it, such as by infringing our patent rights.** The patent to be issued next Tuesday is only the tip of the iceberg of our intellectual property, and there are many more on the way. **Our shareholders expect, and are entitled to, a meaningful return on their investments, and this can be achieved only if our intellectual property is enforced against imitators.** It is flattering to be imitated by others, but it also is evidence of the significance of the contribution that MinuteKey's technology has made to the industry, and **our technology must be protected.**
>
> **Not sure how Hillman will respond to the notice but wanted to give you a heads up as you roll out self service key duplicating kiosks into your stores.** I have attached the notice of issuance and the claims allowed thus far. Please call if you have any additional questions or comments.

(Doc. 119-57 at PageID 4392–4393 (emphasis added).)  The next day, September 6, 2013,

Hoelter sent out the following email:

> **Due to the upcoming issuance of the MinuteKey Patent that will occur on Tuesday and the cease order that will be issued to the Hillman Group (FastKey)** we will be using the MinuteKey Program for all stores asking for the self-assisted key cutting kiosk.  FastKey will continue to install in their approved locations until October 15th.  **Our team will consult with** the Self Service Team, Operations and **Legal** to understand the right course of action **to help in mitigating our risk** during this time.

(Doc. 129-12 at PageID 7062 (emphasis added).)  He then followed-up with Rob Kaslon and

Chris Lohmann at Minute Key:

> I have made a note to all of the divisional that we will use Minute Key for any new store opening or requests.  We have until October 15th to place all kiosks into stores for this year.  After that day there is a blackout period until mid January.

(Doc. 129-62 at PageID 7651.)[10]

    As expected, the '809 Patent issued on September 10, 2013.  (Doc. 58-1 at PageID

1089.)[11]  Thereafter, Walmart Associate General Counsel Rosalyn Mitchell asked Minute Key's

attorney, Stephen Rudisill from the Nixon Peabody firm, for a copy of the patent, and Walmart's

outside counsel, Laura Chapman from the Sheppard Mullin firm, also asked for a claim chart.

(Doc. 119-58 at PageID 4403–4404.)  Rudisill stated that he did not have a claim chart, but could

"walk [Walmart counsel] through the claims during our call."  (*Id.* at PageID 4402.)  Mitchell

declined with the following explanation:

> As you know, Walmart has non-exclusive contracts with both Hillman and Minute Key.  It is important to Walmart to obtain a clear understanding of Minute Key's allegations.  We need an identification of the specific parts or components of the Hillman equipment that Minute Key **believes** infringes and the specific claims Minute Key **alleges** are being infringed.  A claim chart is the best way to

---

[10] Hoelter testified that vendors may not install kiosks after October 15 so that Walmart personnel can focus exclusively on promoting holiday sales.  (Doc. 116, Hoelter Dep. at PageID 3252 (72:13-73:24).)

[11] All claims (both independent and dependent) of the '809 Patent are limited to "fully-automatic kiosks."  (Doc. 58-1 at PageID 1159–1160 (col. 23, line 38-col. 26, line 43); Doc. 119-57 at PageID 4395–4399.)

convey that information.  A verbal explanation without the claim chart is not optimal from our perspective.

(*Id.* (emphasis added).)

Minute Key provided a claim chart on September 13, 2013.  (*Id.*)  Mitchell forwarded it to Douglas Roberts, Hillman's General Counsel, with the following advice:

As I believe you know, Minute Key, Inc. ("Minute Key") **alleges** that it owns U.S. Patent No. 8,532,809 B2 for a "Network of Fully Automatic Self-Service Key Duplicating Kiosks" which was issued September 10, 2013.  Minute Key **appears to suggest** that its patent is being infringed by the Hillman Group's equipment, which is operated on Walmart's premises.

(Doc. 119-59 at PageID 4411 (emphasis added).)  In the same email, she confirmed Walmart's request for a response authored by qualified counsel and asked Hillman to confirm its obligation to indemnify Walmart for any expenses as a result of the infringement allegation.  (*Id.*)  Roberts later executed the "Indemnity Acknowledgement Form" on behalf of Hillman as General Counsel and Secretary.  (Doc. 129-66 at PageID 7665.)

On September 27, 2013, Randy Fagundo sent this email to Minute Key board members Stalder, Frick, and Freeman:[12]

Interesting developments at WalMart.  **They appear to taking [sic] the patent infringement letter very seriously**, see attached letter from WalMart.  **Good news is that Hillman's 1,000 store roll out is halted** and we should get close to installing the 400 we committed to getting installed this year.  I have also attached Hillman's legal counsels [sic] response to our claims chart.

WalMart legal has asked us to set up call [sic] with them and our legal counsel next week to review next steps.  We also have a big meeting in Bentonville the week of October 14th and will learn more about the 2014 roll out plans.

**It's getting exciting!**

(Doc. 129-13 at PageID 7065 (emphasis added).)

---

[12] The email also was sent to Aaron Dupuis.  (Doc. 129-13 at PageID 7065.)  The Court is without adequate information to discern Mr. Dupuis' role.

15

On October 1, 2013, Hillman filed a Complaint against Minute Key, seeking a declaratory judgment of non-infringement and invalidity of United States Patent No. 8,532,809 B2 ("the '809 Patent").  (Doc. 1.)  Minute Key answered and asserted a counterclaim of infringement against Hillman on October 23, 2013.  (Doc. 14.)

**B.  Procedural Posture**

Motion practice in this civil action has been vigorous.  It began on March 17, 2014 when Minute Key moved to dismiss its counterclaim with prejudice (Doc. 28) and dismiss the case for lack of subject-matter jurisdiction (Doc. 29).[13]  Minute Key provided Hillman with a covenant not to sue[14] and maintained that a dismissal with prejudice of its counterclaim, coupled with the covenant not to sue, eliminated any case or controversy between the parties.  (Doc. 35 at PageID 315.)  Hillman opposed dismissal of the action (Doc. 33) and sought to amend its Complaint to include two additional claims under the Lanham Act (15 U.S.C. § 1125(a)(1)(B)) and the Ohio Deceptive Trade Practices Act (Ohio Rev. Code § 4165.02(A)(10)) (Docs. 40, 42).

The Court granted Minute Key's motion to voluntarily dismiss its infringement counterclaim on August 15, 2014.  (Doc. 55 at PageID 770–772.)  And in light of the voluntary

---

[13]  As Randy Fagundo explained to Walmart's Dan Hoelter in an email sent the same day, "Bottom line is that we do not want to spend $4M on legal fees and countless hours of my time and the terms [sic] time fighting with Hillman. Our time and money are better spent building and installing machines in your stores.  We would have to sell millions upon millions of keys to pay for the litigation."  (Doc. 119-56 at PageID 4389.)

[14]  The covenant states as follows:

> Minute Key Inc. ("Minute Key") covenants not to assert a claim of patent infringement against The Hillman Group, Inc. ("Hillman") or its customers as to any claim of the United States Patent Nos. 8,532,809 ("the '809 Patent") or 8,634,951 ("the '951 Patent"). This covenant not to sue covers past and present activities by Hillman with respect to its FastKey key duplicating kiosk and its Key Express key duplicating kiosk. This covenant does not extend to products manufactured, sold or used by Hillman that are not commercially available as of this date. It does not include any modified versions of the FastKey or Key Express key duplicating kiosks that are substantially different than the current versions of these kiosks. In addition, this covenant does not include any other patents that Minute Key currently owns, may hereafter acquire or that may issue in the future.

(Doc. 35-1 at PageID 321.)

dismissal and the covenant not to sue, the Court also determined that it no longer had jurisdiction over Hillman's patent claims[15] and thus granted Minute Key's motion to dismiss with respect to Hillman's declaratory judgment claims. (*Id.* at PageID 772–77.) Finally, the Court granted Hillman leave to file under seal an amended complaint, noting that Hillman's request for the Court to find the case exceptional and award attorney fees under 35 U.S.C. § 285 remained pending. (*Id.* at PageID 777–779.)

Hillman thereafter filed its Amended Complaint on September 4, 2014. (Docs. 56 (SEALED)/58.) In it, Hillman alleges that Minute Key knowingly made false and misleading representations of fact concerning Hillman's FastKey kiosk to Walmart—the parties' mutual customer—in order to gain a business advantage. Minute Key answered (Doc. 60) and filed a motion to change venue (Doc. 61), which the Court denied on February 3, 2015 (Doc. 67). Various discovery disputes followed. (*See, e.g.*, Docs. 80; 81 & 82; 85.) Minute Key's pending Motion, which asks the Court to enter summary judgment in its favor and dismiss Hillman's Amended Complaint with prejudice, is fully briefed and ripe for adjudication.

## II.     STANDARD OF LAW

Although a grant of summary judgment is not a substitute for trial, it is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The process of evaluating a motion for summary judgment and the respective burdens it imposes upon the movant and the non-movant are well-settled. First, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact[.]" *Celotex*

---

[15] Hillman conceded that the covenant not to sue divested the Court of jurisdiction over its non-infringement claim, but argued that jurisdiction remained to determine the validity of the patent.

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see LaPointe v. United Autoworkers Loc. 600*, 8 F.3d 376, 378 (6th Cir. 1993). This burden may be satisfied, however, by the movant "pointing out to the court that the [non-moving party], having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.*, 12 F.3d 1382, 1389 (6th Cir. 1993).

Faced with such a motion, the opposing party must submit evidence in support of any material element of the claim or defense at issue in the motion on which it would bear the burden of proof at trial. *Celotex*, 477 U.S. at 331–32. As "the requirement [of the Rule] is that there be no *genuine* issue of *material* fact," the Supreme Court has made clear that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original). Ancillary factual disputes, those "that are irrelevant or unnecessary[,] will not be counted." *Id.* Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252. Instead, the opposing party must present "significant probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive summary judgment and proceed to trial on the merits. *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339–40 (6th Cir. 1993) (applying *Anderson*, 477 U.S. at 249–50; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

At this summary judgment stage, it is not the Court's role "to weigh the evidence and determine the truth of the matter but [rather] to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In so doing, "[t]he evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–59 (1970) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962))). Adherence to this standard, however, does not permit the Court to assess the credibility of witnesses. *See Adams v. Metiva*, 31 F.3d 375, 378 (6th Cir. 1994) (citing *Anderson*, 477 U.S. at 255)).

## III.    ANALYSIS

Section 43 of the Lanham Act permits a civil action against "[a]ny person, who on or in connection with any goods or services, . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, [or] qualities[] . . . of his or her or another person's goods, services, or commercial activities[.]" 15 U.S.C. § 1125(a)(1)(B). Likewise, under the Ohio Deceptive Trade Practices Act ("ODTPA"), a civil action may be filed when "[a] person . . . [,] in the course of the person's business, vocation, or occupation, . . . [d]isparages the goods, services, or business of another by false representation of fact[.]" Ohio Rev. Code § 4165.02(A)(10). Courts "evaluate an Ohio deceptive trade practices claim under the same analysis as that used for Lanham Act claims." *Papa Ads, LLC v. Gatehouse Media, Inc.*, 485 F. App'x 53, 55 (6th Cir. 2012) (citing *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 920 (6th Cir. 2003)). Thus, Hillman's federal and state claims rise or fall together.

To succeed on an unfair competition claim, a plaintiff generally must establish the following elements:

> 1) the defendant made false or misleading statements of fact concerning [its] own product or another's; 2) the statement actually or tends to deceive a substantial portion of the intended audience; 3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; 4) the advertisements were introduced into interstate commerce; and 5) there is some causal link between the challenged statements and harm to the plaintiff.

19

*Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 613 (6th Cir. 1999). And if, as here, the claim involves marketplace representations of patent infringement, a plaintiff also must establish a sixth element—namely, that the representation was made in bad faith. *Zenith Elec. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1353 (Fed. Cir. 1999); *see also Genlyte Thomas Grp., LLC v. Nat'l Serv. Indus., Inc.*, 262 F. Supp. 2d 753, 756–57 & n.2 (W.D. Ky. 2003), *Veteran Med. Prods., Inc. v. Bionix Dev. Corp.*, No. 1:05-cv-655, 2009 WL 891724, at *5 (W.D. Mich. Mar. 31, 2009). Proof of bad faith is not required by statute. Yet "adding a bad faith requirement to a § 43(a) claim in th[is] context . . . give[s] effect both to the rights of patentees as protected by the patent laws under ordinary circumstances, and to the salutary purposes of the Lanham Act to promote fair competition in the marketplace." *Zenith*, 182 F.3d at 1354.

Minute Key asserts that Hillman falls short regarding two of the six elements. In addition, Minute Key contends that Hillman cannot prove that its assertions of patent infringement were "objectively baseless." *See GP Indus., Inc. v. Eran Indus., Inc.*, 500 F.3d 1369, 1375 (Fed. Cir. 2007). Finally, Minute Key argues that Walmart's license agreement with Hillman concerning placement of Hillman's FastKey kiosks undermines recovery of any damages sought in connection with its unfair competition claim.

Each premise will be addressed in turn. With respect to all of them, the Court concludes that genuine issues of material fact exist, thus precluding an award of summary judgment.

### A. Minute Key's Statements—Fact or Opinion?

Minute Key urges that Hillman cannot satisfy the first element inasmuch its communications with Walmart regarding patent infringement by Hillman were statements of *opinion* rather than statements of fact. *See Podiatric Physicians*, 185 F.3d at 614. ("[A] Lanham

20

Act claim *must* be based upon a statement of fact, not of opinion.") (emphasis added). In support, Minute Key points to Randy Fagundo's September 5, 2013 email to Walmart in which he states that it "appears" that Hillman's FastKey kiosk infringes the '809 Patent. (Doc. 119-57 at PageID 4392.) Minute Key also notes that its patent attorney Stephen Rudisill used the same qualifying language in a letter to Hillman's CEO James Waters. (Doc. 58-7 at PageID 1191.) Further, Minute Key maintains that Walmart "understood" that Minute Key simply was stating its *opinion* by virtue of Associate General Counsel Mitchell's email to Hillman's General Counsel that Minute Key "appears to suggest" infringement. (Doc. 119-59 at PageID 4411.) The Court is not persuaded.

These excerpts must be interpreted in context. *Podiatric Physicians*, 185 F.3d at 615 ("[T]he statement *in context* is more a statement of opinion than a statement of fact.") (emphasis added); *Champion Labs., Inc. v. Parker-Hannifin Corp.*, 616 F. Supp. 2d 684, 695 (E.D. Mich. 2009) ("To decide whether the statements [a]re statements of fact or opinion, the Court must evaluate the statements *within context*.") (citing *Podiatric Physicians*, emphasis added). Neither Fagundo's email nor Rudisill's letter were equivocal in nature. Both communications can be read to state the fact Hillman is a patent infringer:

- Minute Key "will be sending Hillman a patent infringement notice next Tuesday when our patent, U.S. Patent NO. 8,532,809 is issued."

- Minute Key has "no choice but to enforce our intellectual property against anyone who attempts to misappropriate it, such as by infringing our patent rights."

- "Our shareholders expect, and are entitled to, a meaningful return on their investments, and this can be achieved only if our intellectual property is enforced against imitators."

- "[O]ur technology must be protected."

- "Not sure how Hillman will respond to the notice but wanted to give you a heads up as you roll out self service key duplicating kiosks into your stores."

(Doc. 119-57 at PageID 4392.)

- "[W]e request that The Hillman Group terminate this infringement immediately. Please advise us by the end of this month whether The Hillman Group will comply with this request."

(Doc. 58-7 at PageID 1191.)

There is ample evidence, moreover, from which a jury could conclude that Walmart *did* understand these statements to be statements of fact. Associate General Counsel Mitchell, through outside counsel Chapman, asked Minute Key for a claim chart. (Doc. 119-58 at PageID 4403.) She also required Hillman to acknowledge its obligation, incurred by virtue of Section 9 of the Kiosk License Agreement, to indemnify Walmart. (Doc. 119-59 at PageID 4411–4412.) Dan Hoelter immediately advised his nationwide divisional of "the upcoming issuance of the MinuteKey Patent that will occur on Tuesday and the cease order that will be issued to the Hillman Group (FastKey)." (Doc. 129-12 at PageID 7062.) He also stated, "Our team will consult with . . . Legal to understand the right course of action to help in mitigating our risk during this time." (*Id.*) Then, on September 27, 2013, Walmart announced to both Hillman and Minute Key that it was "suspending the deployment of key duplication machines" because Minute Key had made a claim of patent infringement. (Doc. 129-18 at PageID 7098.) The same day, Randy Fagundo told Minute Key board members that Walmart appeared to be taking the patent infringement letter "very seriously." (Doc. 129-13 at PageID 7065.) Other examples could be cited, but these instances more than suffice.

The Sixth Circuit's decision in *Podiatric Physicians* unquestionably binds this Court. But we agree with Hillman that it does not require us to *ipso facto* characterize patent infringement allegations to be "opinions" and therefore exempt them from liability. (*See* Doc.

22

129 at PageID 6764.)  To do so would ignore the premise that triggered the interlocutory appeal in *Zenith*[16] and upon which its holding is contingent.  *Zenith*, 182 F.3d at 1353 ("[W]e conclude that, before a patentee may be held liable under § 43(a) for marketplace activity in support of its patent, and thus be deprived of the right to make statements about *potential* infringement of its patent, the marketplace activity must have been undertaken in bad faith.")  (emphasis added).

The Court concludes that question of material fact exists as to whether Minute Key made a statement of fact regarding Hillman, the *sine qua non* of a Lanham Act claim.  Summary judgment, therefore, is not indicated.

### B.  Minute Key's Statements—Widely Disseminated?

In *Grubbs v. Sheakley Group, Inc.*, the Sixth Circuit recently considered "the reach of the Lanham Act with respect to false advertising claims."  807 F.3d 785, 799 (6th Cir. 2015).  For a statement of fact to be actionable as unfair competition, it must constitute "commercial speech" made "for the purpose of influencing customers to buy the defendant's goods or services" that is disseminated either widely enough "to the relevant purchasing public" or "to a substantial portion of the plaintiff's or defendant's existing customer or client base."  *Id.* at 801.[17]  Minute Key observes that there is no dispute that Hillman is the "industry leader" in the key duplication market, and that the commercial speech consists of Minute Key's statements to a single Hillman

---

[16] The precise question presented to the Federal Circuit in *Zenith* was one of preemption:

> "[I]f a patentee informs a competitor's customers that the competitor is an infringer (and implicitly or explicitly that the customer who deals with the competitor may become one as well), is the patentee protected from the usual standards for unfair trade practices, imposed by federal and state unfair competition laws, on the theory that the rights accorded a patentee to protect and enforce the patent supersede the usual anticompetition rules?

*Zenith*, 182 F.3d at 1345–46.

[17] The Sixth Circuit expressly declined to adopt the requirement that the parties be in competition with each other, *see* 807 F.3d at 801, a ruling that does not affect any of the questions presented in this civil action.

customer, Walmart.  Accordingly, Minute Key maintains that the dissemination requirement
cannot be met as a matter of law.  The Court disagrees.

Minute Key relies in large part on the following excerpt:

[W]e recognize *the concern of other courts* in rendering too much commercial
speech actionable as false advertising.  *See Seven-Up* [*Co. v. Coca-Cola Co.*], 86
F.3d [1379,] 1384 [(5th Cir. 1996)] (discussing a district court's concern that to
"permit a single private correspondence" to fall within this subsection of the
Lanham Act "would sweep within the ambit of the Act any disparaging comment
made in the context of a commercial transaction").

*Grubbs*, 807 F.3d at 801 (emphasis added).  It argues that this language stands for the
proposition that "[c]ommunicating with just *one* of an industry leader's customers in a single
transaction does not satisfy the wide dissemination requirement."  (Doc. 119 at PageID 3966
(emphasis in original).)  Hillman counters that the Fifth Circuit actually decided that "[w]here
the potential purchasers in the market are relatively limited in number, *even a single promotional
presentation to an individual purchaser may be enough* to trigger the protections of the
[Lanham] Act."  *Seven-Up*, 86 F.3d at 1386 (emphasis added).  Minute Key counters that the
Sixth Circuit did not cite this portion of the Fifth Circuit's opinion, from which an inference of
disagreement should be drawn.

To recognize the "concern of other courts" is not tantamount to the Sixth Circuit adopting
that same concern as its own.  Regardless, there is no need for this Court to speculate as to the
purpose that citation was meant to serve.  The *Grubbs* panel defined "commercial advertising or
promotion" to include speech that is disseminated widely enough "to a *substantial portion* of the
plaintiff's or defendant's *existing customer* or client *base*," 807 F.3d at 801 (emphasis added),
and it is this standard that we must apply.

The proper "customer or client base" here should be tied to the market for self-service key duplication kiosks, *not* key duplication equipment generally.[18] Walmart obviously is an existing customer of both Hillman and Minute Key in this market. Minute Key contends, however, that Walmart, as a *single* customer, cannot constitute a "substantial" portion of Hillman's customer base. Hillman counters that its FastKey kiosk was designed specifically for Walmart and that it was never "seriously" marketed to other retailers. (Doc. 129 at PageID 6765; *see* Doc. 112, Seeds Dep. at PageID 2885 (25:18)–2886 (26-25), 2895 (64:2-15).) Minute Key challenges Hillman's position that its marketing efforts to other customers were *de minimis*, citing unsuccessful ventures with Orchard Supply Hardware[19], Lowe's[20], and Menards[21].

---

[18] As noted earlier, "Hillman markets **multiple separate** key duplication systems." (Doc. 119-5, The Hillman Cos., Inc., Annual Report (Form 10-K) (Mar. 27, 2015) at PageID 4024 (emphasis added).) Its FastKey system is not run out of its Cincinnati headquarters, but rather is based in Tempe, Arizona. (*See* Doc. 111, Roberts Dep. at PageID 2857 (552:18-25).) And Minute Key itself acknowledges that it competes with Hillman in *one* distinct market:

> The technology that has been developed over the last 8 years by our two founders is our most significant asset and one that we must protect otherwise the value of our business is greatly diminished. Hillman is a large company with many lines of business but we only have one line of business, networked **self service key cutting kiosks, and it's our life blood.**

(Doc. 129-29, 11/04/2013 email from Randall Fagundo to Rosalyn Mitchell at PageID 7193–7193 (emphasis added).)

[19] (*See* Doc. 119-6, 6/20/2011 email from Hillman's Gary Seeds to Orchard Supply Hardware's Debbie Bayani at PageID 4180 ("Debbie, as a partner to Orchard Supply for nearly 16 years I am confused and disappointed that a competitor can be given an opportunity to encroach a category where Hillman has invested millions to refresh and grow the business. . . Self-service key duplication is new technology to the industry and Hillman has been developing this technology for several years. In fact our first system was tested in the market nearly 12 years ago."), 4180 ("Our program is placed with several retailers and we do believe self-service key duplication has a place in the industry.").)

[20] (*See* Doc. 119-2, 7/19/2011 email from Mick Hillman to Officers Group at PageID 3984 ("I have attached Chip [Church]'s note to me and my note to the board on the recent loss to Minute Key at Lowes. I suppose there is a fair amount of blame to be shared by many of us but I personally view the lack of progress on reducing miscuts as the root reason for the door being held open [for Minute Key]. In addition in spite of how much time we spend at Lowes we did not get a 'heads up' call on a competitor. As CEO these were (are) clearly my responsibility and I will be more focused on better execution moving forward. Little sense moaning about what happened..we now need to focus on improving and protecting what we have.")

[21] (*See* Doc. 119-21, 7/31/2013 email from Hillman's Jan Workinger to Hillman's Gary Seeds, at PageID 4245 ("Was told at the NHS a decision was made the week before to go with MinuteKey. Menards said that our Fastkey did not meet the selection and holding power they were looking for, our margins were too small and our rollout was not quick enough and at that time that was the best our company could provide. Menards is now committed to the change with Minute Key.").)

As a general principle, the Court concludes that statements to a single customer *can* trigger the protections of the Lanham Act "if the market at issue is very small and discrete." *See Champion Labs.*, *supra*, 616 F. Supp. 2d at 694–95. But whether the market at issue is properly limited to Walmart is a question of material fact for the jury. Thus, Minute Key is not entitled to summary judgment on the basis of insufficient dissemination.

### C.  Minute Key's Statements—Objectively Baseless?

The law regarding proof of bad faith is case-specific. *Zenith,* 182 F.3d at 1354 ("Exactly what constitutes bad faith remains to be determined on a case by case basis. Obviously, if the patentee **knows that the patent is** invalid, unenforceable, or **not infringed**, yet represents to the marketplace that a competitor is infringing the patent, **a clear case of bad faith representations is made out**.") (emphasis added).

Minute Key contends that *Zenith*'s bad-faith standard cannot be satisfied unless Hillman can demonstrate that Minute Key's claim of patent infringement was "objectively baseless." *GP Indus., Inc. v. Eran Indus., Inc.*, 500 F.3d 1369, 1375 (Fed. Cir. 2007) (citing *Globetrotter Software, Inc. v. Elan Computer Group*, *Inc.*, 362 F.3d 1367, 1375 (Fed. Cir. 2004)). And that determination depends on whether the infringement accusation was "so unreasonable that no reasonable litigant could believe it would succeed." *iLOR, LLC v. Google, Inc.*, 631 F.3d 1372, 1378 (Fed. Cir. 2011). Only if there is a finding that the accusation was objectively baseless can Minute Key's subjective motivation be considered. *See id.*

Minute Key further contends that *iLOR* stands for the proposition that "marketing documents" are irrelevant to the objectively baseless inquiry. (Doc. 119 at PageID 3968.) Thus, it suggests this Court would commit reversible error should it take into account Minute Key's

26

characterization to Walmart and other potential customers that its kiosk was fully automatic while Hillman's was not.[22]  (*Id.*)

The issue in *iLOR*, a patent infringement action, was whether the case was properly found to be "exceptional" under 35 U.S.C. § 285, thus allowing an award of attorneys' fees and costs and expenses.  631 F.3d at 1374.  The Federal Circuit concluded that it was not, and quoted from its holding in the first appeal deciding that iLOR's claim construction was incorrect:

> We also note that the contention as to iLOR's representations about its commercial product vis-à-vis Google's Notebook product are irrelevant in finding objective baselessness.  Prior to commencing suit, iLOR's CEO, Steve Mansfield, wrote a blog entry that identified ILOR's automatically displayed "fly-out" toolbar as a feature that differentiated iLOR's product from Google's product. From the statements, the district court inferred that iLOR must have known that Google did not infringe its patents.  However these statements are irrelevant to the issue of objective baseless.  **A finding of objective baselessness is to be determined by the record made in the infringement proceedings**.

*Id.* at 1380 (citations omitted) (emphasis added).

To apply *iLOR*'s holding to this Lanham Act case—where marketplace representation is the heart of the cause of action—would be absurd.  Thus, the Court will allow consideration of Minute Key's marketing documents.  These—combined with Minute Key's board member and investor "wonder[ing] if there is any way we can use the patent applications to create some FUD with Walmart re Hillman,"[23] and quips from its CEO such as "Fuck Hillman, they don't know they are messing with a pirate"[24] and "Need to whack them now!"[25] and "Thinking about raising the patent card"[26] and "They appear to [be] taking the patent infringement letter very seriously .

---

[22]  By way of example, during the January 24, 2013 Business Review discussed earlier, Minute Key represented to Walmart that its kiosk was "Fully Automated" whereas Hillman's FastKey was not.  (Doc. 129-7 at PageID 6984.) Minute Key repeated these representations to Walmart-Canada on February 14, 2013 (Doc. 129-49 at PageID 7468, 7482) and to The Home Depot, U.S. and Canada on April 22 and May 1, 2013, respectively (Doc. 129-50 at PageID 7490, 7524).
[23]  (Doc. 129-6 at PageID 6967.)
[24]  (Doc. 129-45 at PageID 7448.)
[25]  (*Id.*)
[26]  (Doc. 129-11 at PageID 7056.)

. . It's getting exciting!"[27]—unmistakably create an issue of material fact with respect to bad faith.  Summary judgment, therefore, would be improper.

### D. Kiosk License Agreement between Walmart & Hillman

In March 2013, in the wake of the head-to-head pilot competition, Walmart and Hillman executed a Kiosk License Agreement.  (Doc. 119-64 at PageID 4556–4577.)  That Agreement does not guarantee Hillman a minimum number of stores beyond those listed in Exhibit A.  (*See* Doc. 119-64 at PageID 4556 (Section 1.5), 4570 (Section 15.5), 4573–4575 (Exhibit A).)  It also contains an integration clause, meaning that any prior oral or written agreements between the parties are superseded, and a clause requiring any amendments to the Agreement be in writing and signed by both parties.  (*Id.* at PageID 4569 (Section 15.2).)  According to Minute Key, these terms preclude Hillman from proving damages as to any additional Walmart stores it was not awarded.

If Hillman were suing Walmart for breach of contract, the Court would concur.  Instead, though, Hillman is suing Minute Key for unfair competition, and questions of material fact linger.  The day after Minute Key confirmed to Walmart that it would be sending Hillman a patent infringement notice, Walmart immediately decided to "use Minute Key for any new store opening or requests."  (Doc. 129-62 at PageID 7651.)  Walmart specifically attributed its decision to "the cease order that will be issued to the Hillman Group (FastKey)."  (Doc. 129-12 at PageID 7062.)  Prior to the infringement accusation, Hillman was the vendor of choice.  After the infringement accusation, Hillman purportedly was told by Walmart that it was capped at 1,000 kiosks "forever."  (Doc. 129-26 at PageID 7157.)

Hillman insists that it would have remained the vendor of choice if the infringement accusation had not been made, and thus it would have been entitled to any future business under

---

[27] (Doc. 129-13 at PageID 7065.)

28

a "right of first refusal." (*See* Doc. 129 at PageID 6769.)  Minute Key vociferously disputes this claim. (*See* Doc. 130 at PageID 7701–7704.)  Clearly, this so-called "right" is not contractual in nature.  Whether it was Walmart's "custom" in dealing with vendors of choice, however, is material to Hillman's unfair competition claim.  Regarding the pilot competition, Walmart's Shawn Jones testified that "Hillman was awarded, by vote, another 900 stores and preferred as a partner of choice and first right of refusal." (Doc. 109, Jones Dep. at PageID 2647 (34:17-19).)[28] He also testified that he had a conversation with Minute Key's Randy Fagundo in which he "clearly stated that Hillman won the pilot and was the partner of choice with first right of refusal to move forward." (*Id.* at PageID 2669 (123:22-24).)  And, regarding a conversation with Hillman's Gary Seeds, Jones recalled discussing first right of refusal, which he described as "standard operating procedure with a new program as a go forward partner." (*Id.* at PageID 2680 (166:22-25).)  In contrast, his subordinate and Minute Key liaison April Crawford advised Hillman's Cindi Yancey that she was not sure that first right of refusal was the actual arrangement or "the right thing to do for our stores." (Doc. 130-2 at PageID 7737.)  The jury will have to weigh this evidence, and judge the bias—if any—of these and other witnesses, including Minute Key's Randy Fagundo who testified that his understanding of "preferred vendor status with Walmart" is that "you are entitled [to] first dibs, so to speak, on any store that requests a key cutting kiosk." (Doc. 103, Fagundo Dep. at PageID 2365 (239:8-13).)

Hillman additionally seeks a different set of damages that Minute Key's "1,000 only" argument does not address.   In response to Minute Key's accusation of patent infringement, Walmart imposed a freeze on any additional installations of Hillman's FastKey kiosks "until further notice." (Doc. 129-18 at PageID 7098.)  At this point, Hillman was in the process of

---

[28] Jones later conceded that he did not know whether the term "partner of choice with first right of refusal" had been reduced to writing.  (Doc. 109, Jones Dep. at PageID 2678 (161:16-24).)

placing its pilot-won 1,000 kiosks across the country, with 303 yet to be installed.  (*See* Doc. 129-16 at PageID 7092; Doc. 110, Roberts Dep. at PageID 2759 (170:6-171:12).)  The 1000th kiosk finally was not placed until May 8, 2014.  (Doc. 129-64 at PageID 7658–7659.)

Whether the delay in the national rollout was owing to Minute Key's accusation of patent infringement likewise is material to Hillman's unfair competition claim.  There is a suggestion that some of Hillman's kiosks were still in production.  (Doc. 110, Roberts Dep. at PageID 2759 (170:14-171:22).)  Obviously Hillman could not place kiosks it did not have.  The holiday blackout period that runs from mid-October to mid-January—which precludes *any* vendor from placing *any* kiosk—could have been a factor as well.  The jury will need to consider these circumstances, and others, on the subject of causation.

## IV.    CONCLUSION

For the all the foregoing reasons, Defendant's Motion for Summary Judgment is hereby **DENIED**.

**IT IS SO ORDERED**.

Dated:  July 8, 2016                    S/Susan J. Dlott_____
                                        Judge Susan J. Dlott
                                        United States District Court