IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| THE HILLMAN GROUP, INC., | : | Case No. 1:13-cv-00707 |
| | : | |
| Plaintiff, | : | Judge Susan J. Dlott |
| | : | |
| v. | : | **ORDER DENYING** |
| | : | **DEFENDANT MINUTE KEY INC.'S** |
| MINUTE KEY INC., | : | **RENEWED MOTION FOR** |
| | : | **JUDGMENT AS A MATTER OF LAW** |
| Defendant. | : | |
| | : | |

This matter is before the Court on Defendant Minute Key Inc.'s Renewed Motion for Judgment as a Matter of Law. (Doc. 255.) Plaintiff, The Hillman Group, Inc., has filed a memorandum in opposition (Doc. 264), to which Minute Key has replied (Doc. 267). For the reasons that follow, Defendant's Motion will be DENIED.

## I.    BACKGROUND

This litigation—between competitors in the self-service, automatic key duplication industry[1]—began on October 1, 2013 as a patent case. Hillman filed a Complaint against Minute Key, seeking a declaratory judgment of non-infringement and invalidity of U.S. Patent No. 8,532,809 B2 ("the '809 patent"). (Doc. 1.) Minute Key answered and asserted a counterclaim of infringement. (Doc. 14.) In an effort to conclude the dispute, Minute Key moved to dismiss its counterclaim with prejudice (Doc. 28) and to dismiss the case for lack of subject-matter jurisdiction (Doc. 29). Hillman opposed both motions (Docs. 32, 33), prompting Minute Key to provide Hillman with a covenant not to sue. (Doc. 35-1 at PageID 321.) Thereafter, Hillman

---

[1] Hillman operates a kiosk known as "FastKey." Minute Key markets its kiosk under its own name, "minuteKEY."

conceded that the covenant not to sue divested the Court of jurisdiction over its non-infringement claim, but argued that jurisdiction remained to determine the validity of the patent. (Doc. 39 at PageID 1380–81.) At this point Hillman also filed a motion to amend its Complaint to add a claim for false advertising and misrepresentation under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), and a claim for violation of the Ohio Deceptive Trade Practices Act ("ODTPA"), Ohio Rev. Code § 4165.02(A)(10). (Doc. 40.)

The Court granted Minute Key's motion to voluntarily dismiss its infringement counterclaim. (Doc. 55 at PageID 770–72.) And, in light of the voluntary dismissal and the covenant not to sue, the Court determined that it no longer had jurisdiction over Hillman's remaining invalidity claim and granted Minute Key's Rule 12(b)(1) motion to dismiss. (*Id.* at PageID 772–77.) However, the Court also granted Hillman leave to amend its Complaint to add the Lanham Act and ODTPA claims. (*Id.* at PageID 777–79.) Thus, pending as of September 4, 2014 were Hillman's allegations that Minute Key knowingly made false and misleading representations of fact concerning Hillman's FastKey kiosk to Walmart—the parties' mutual customer—in order to gain a business advantage. (Docs. 56 (SEALED)/58.)

Two revised scheduling orders later (Docs. 71, 84), Minute Key moved for summary judgment. (Docs. 118 (SEALED)/119.)[2] It argued that Hillman could not establish the first element of proof in a Lanham Act case, urging that its communications with Walmart regarding patent infringement by Hillman were statements of opinion rather than statements of fact. It also argued that, regardless, the statements were not sufficiently disseminated. In addition, Minute Key maintained that Hillman could not demonstrate that Minute Key's claim of patent

---

[2] The voluminous amount of evidence submitted for and against judgment as a matter of law pursuant to Fed. R. Civ. P. 56(a) will not be summarized again here. Rather, the reader is referred to this Court's Order Denying Defendant's Motion for Summary Judgment. (Doc. 136.)

infringement was "objectively baseless."[3]  Finally, Minute Key contended that Walmart's license agreement with Hillman concerning placement of Hillman's FastKey kiosks undermined recovery of any damages sought in connection with its unfair competition claim.  With respect to each premise, the Court concluded that genuine issues of material fact existed, and, accordingly, on July 8, 2016, denied Minute Key's motion.  (Doc. 136.)

The Court held a Final Pretrial Conference in this civil action the same day it released its Order denying summary judgment.  At that time, the Court agreed to allow the parties to brief the issue of whether a claim construction of the '809 patent, otherwise known as a *Markman*[4] hearing, was necessary before proceeding to trial before a jury on August 22, 2016.  Minute Key argued that it was (Doc. 138), while Hillman maintained that it was not (Doc. 139).  Minute Key's argument was reminiscent of its argument made in support of summary judgment:  The statements that Hillman believed to be actionable were statements about patent infringement.  To prevail, therefore, Hillman must demonstrate that the statements were "objectively baseless" as part of the bad-faith requirement established in *Zenith Elec. Corp. v. Exzec, Inc.*, 182 F.3d 1340 (Fed. Cir. 1999).  That determination depended, in turn, on whether the infringement accusation was "so unreasonable that no reasonable litigant could believe it would succeed."  *iLOR, LLC v. Google, Inc.*, 631 F.3d 1372, 1378 (Fed. Cir. 2011).  In Minute Key's view, Hillman could not establish objective baselessness without first proving that its FastKey kiosk does not infringe the minuteKEY kiosk.  And to meet that burden, Minute Key insisted that the claim terms in dispute must be construed by the Court in advance of the trial.

---

[3] *See GP Indus., Inc. v. Eran Indus., Inc.*, 500 F.3d 1369, 1375 (Fed. Cir. 2007) (citing *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367, 1375 (Fed. Cir. 2004)).
[4] *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996).

Hillman countered that a claim construction was not necessary when the claim terms—"fully-automatic" and "fully automatic"—were clear on their face.[5] Indeed, to do so, Hillman believed, would usurp the role of the jury.[6] Hillman also maintained that the Court should decline to construe the claim terms because technical people skilled in the art used them consistent with their plain meaning.[7] Minute Key representatives had repeatedly characterized their own kiosk as being fully automatic because it does not require user involvement, and Hillman agreed. And they had repeatedly characterized Hillman's FastKey kiosk as *not* fully automatic because it *does* require user involvement, and Hillman again agreed. Accordingly, Hillman contended there was no dispute at the time the infringement statements were made among those of skill in this art as to what "fully automatic" does and does not cover.[8]

The Court, siding with Hillman, concluded that a claim construction was not necessary. (Doc. 140.) It found that the claim terms "fully-automatic" and "fully automatic" were not

---

[5] *Procter & Gamble Co. v. CAO Grp., Inc.*, No. 1:13-cv-337, 2014 WL 2117047, at *8–9 (S.D. Ohio May 21, 2014) (Black, J.) (despite dispute of the parties over a claim term, "the Court finds that the phrase is clear on its face and does not require construction"); *see also IOEngine, LLC v. Interactive Media Corp.*, Nos. 14-1571-GMS, 14-1572-GMS, 2016 WL 1121938, at *1 n.44 (D. Del. Mar. 21, 2016) ("The court rejects the proposals of [the parties], which do nothing to improve the meaning of claim terms that are already clearly understood when read in the context of the claim overall.")

[6] *Best Mgmt. Prods., Inc. v. New England Fiberglass, L.L.C.*, No. 07-151-JL, 2008 WL 2037349, at *8 n.10 (D.N.H. May 12, 2008) ("[C]ourts must guard against [ ] 'over-construction' of patent claims. An overly precise or specific interpretation of claim language, especially language with a plain meaning, may be deemed excessive in that it invades the province of the trier of fact.") (citation and quotation omitted).

[7] *Nomadix, Inc. v. Hospitality Core Servs. LLC*, No. CV 14-08256DDP (VBKx), 2016 WL 344461, at *4 (C.D. Cal. Jan. 27, 2016) (holding that when a "term has an ordinarily understood meaning" used consistently in the art, "there is no reason to depart from this ordinary meaning" and thus no need to construe the term).

[8] *See* Doc. 108 at PageID 2627(45:1)–2628 (47:4) (deposition testimony of Dani Freeman, Minute Key Vice President of Engineering and the '809 patent inventor, that the FastKey kiosk is not fully automatic because "there are various manual operations required," referring to the need for the customer to retrieve and insert a key blank); Doc. 109 at PageID 2649 (42:21-45:1) (deposition testimony of Shawn Jones, former Walmart Director of Leasing Operations, that the FastKey kiosk was not 100% automated because it requires the customer to insert a key blank); Doc. 113 at PageID 2977 (377:11-379:25) (deposition testimony of Gary Seeds, Hillman Senior Vice President of Sales, that he believed the minuteKEY kiosk was automated, but FastKey was not because "the consumer has to retrieve the key and insert it into the cutting mechanism"); Doc. 124 at PageID 5135 (76:15)–5137 (78:25) & PageID 5337 (278:6)–5338 (279:12) (deposition testimony of Chris Lohmann, Minute Key Vice President of Marketing, describing on Facebook and to Walmart that its kiosk was automated but FastKey was nonautomated because when "the key is dispensed, then you have to put it in the cutter").

technically complex and had a plain meaning that a jury, the rightful trier of fact, could and would understand.[9]

After a two-day hearing with respect to deposition designations, the jury trial in this matter began on August 24, 2016. It ended with a verdict returned in Hillman's favor on September 7, 2016. Answering a series of interrogatories, the jury found that Hillman proved, by a preponderance of the evidence, that Minute Key made a "literally false" statement of fact to Walmart about Hillman's FastKey kiosk; that Minute Key's statement actually deceived, or was likely to deceive, Walmart; that Minute Key's deception was material in that it was likely to influence purchasing decisions by Walmart; and that Minute Key's statement resulted in actual or probable injury to Hillman. (Verdict Form, Doc. 240 at PageID 12464.) The jury also found that Hillman proved, by the higher standard of clear and convincing evidence, that Minute Key knew that Hillman's FastKey kiosk did not infringe the '809 patent but nonetheless represented to Walmart that it did. (*Id.* at PageID 12465.) The jury awarded Hillman damages in the amount of $164,072 with respect to the September 27, 2013 "rollout freeze" at Walmart. (*Id.* at PageID 12466.) This amount, however, was only one-half of the amount ($328,144) computed by Hillman's opinion witness regarding the freeze.[10] And the jury declined to award any damages to Hillman because of lost placement of FastKey kiosks beyond the initial 1,000 awarded by Walmart from February 2014 to the present *or* because of Minute Key kiosk placements beyond the initial 400 awarded by Walmart. (*See id.*) The jury's verdict, therefore, was only a partial victory for Hillman.

---

[9] *See Orion IP, LLC v. Mercedes-Benz USA, LLC*, 516 F. Supp. 2d 720, 732 (E.D. Tex. 2007) (stating that when the ordinary meaning of a claim term—"questions"—is apparent, "there is no need to construe the term, much less to stringently limit the meaning of [it] as Defendants would like") (quoting from a previous *Markman* opinion).

[10] *See* Joint Exh. 2053 at JX-2053-0004–0005; Plaintiff's Exh. 244 at PX-244-0001; Plaintiff's Exh. 245 at PX-245-0001.

Minute Key moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a)(2) after the close of Hillman's case-in-chief and again after the close of all of the evidence but before submission of the case to the jury. In the wake of the jury's verdict, Minute Key now renews its Motion.

## II.      STANDARD OF LAW

The standard for a renewed motion for judgment as a matter of law under Fed. R. Civ. P. 50(b) is the same as one under Rule 50(a) made during trial. Such a motion "may only be granted if, when viewing the evidence in a light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party." *Barnes v. City of Cincinnati*, 401 F.3d 729, 736 (6th Cir. 2005). The court "may not weigh the evidence, question the credibility of witnesses, or substitute [its] own judgment for that of the jury." *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 306 (6th Cir. 2016). Further, the court "must indulge all presumptions in favor of the validity of the jury's verdict, and should refrain from interfering with a jury's verdict unless it is clear that the jury reached a seriously erroneous result." *Williams v. Nashville Network*, 132 F.3d 1123, 1131 (6th Cir. 1997) (internal quotation marks and citation omitted). A movant carries a heavy burden, because, to succeed, "he must overcome the substantial deference owed a jury verdict." *Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 614 (6th Cir. 2007). When "[g]iven the evidence presented . . . reasonable minds could render a verdict in favor of [the non-movant]," a Rule 50 motion must be denied. *Easley v. Haywood*, No. 1:08-cv-601, 2016 WL 1614019, at *3 (S.D. Ohio Apr. 22, 2016) (Black, J.). As one district court in this circuit has summarized the standard, "[i]n short, every effort must be

made to uphold the verdict if reasonably possible." *In re Scrap Metal Antitrust Litig.*, No. 1:02 CV 0844, 2006 WL 2850453, at *8 (N.D. Ohio Sept. 30, 2006).

## III.    ANALYSIS

Section 43 of the Lanham Act permits a civil action against "[a]ny person, who on or in connection with any goods or services, . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, [or] qualities[] . . . of his or her or another person's goods, services, or commercial activities[.]"  15 U.S.C. § 1125(a)(1)(B). This type of claim is commonly known as a "false advertising" claim.  Likewise, under the ODTPA, a civil action may be filed when "[a] person . . . [,] in the course of the person's business, vocation, or occupation, . . . [d]isparages the goods, services, or business of another by false representation of fact[.]"  Ohio Rev. Code § 4165.02(A)(10).  Courts "evaluate an Ohio deceptive trade practices claim under the same analysis as that used for Lanham Act claims." *Papa Ads, LLC v. Gatehouse Media, Inc.*, 485 F. App'x 53, 55 (6th Cir. 2012) (citing *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 920 (6th Cir. 2003)).  Thus, as we noted at the summary judgment stage (*see* Doc. 136 at PageID 7817), Hillman's federal and state claims rise or fall together.

To succeed on an unfair competition claim, a plaintiff generally must establish the following elements:

> 1) the defendant made false or misleading statements of fact concerning [its] own product or another's; 2) the statement actually or tends to deceive a substantial portion of the intended audience; 3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; 4) the advertisements were introduced into interstate commerce; and 5) there is some causal link between the challenged statements and harm to the plaintiff.

7

*Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*,

185 F.3d 606, 613 (6th Cir. 1999). And if, as here, the claim involves marketplace

representations of patent infringement, a plaintiff also must establish a sixth element—namely,

that the representation was made in bad faith. *Zenith, supra,* 182 F.3d at 1353.[11] Bad faith is a

"threshold" element. *Judkins v. HT Window Fashion Corp.*, 529 F.3d 1334, 1338–39 (Fed. Cir.

2008) (citing *Zenith*). Notably, it must be established by the greater standard of clear and

convincing evidence. *Henrob Ltd. v. Bollhoff Systemtechnick GMBH & Co.*, No. 05-CV-73214-

DT, 2009 WL 3188583, at *15 (E.D. Mich. Sept. 29, 2009) (quoting *Golan v. Pingel Enterprise,

Inc.*, 310 F.3d 1360, 1371 (Fed. Cir. 2002) ("To survive summary judgment, the party

challenging such statements must present affirmative evidence sufficient for a reasonable jury to

conclude that the patentee acted in bad faith, **in light of the burden of clear and convincing

evidence that will adhere at trial**.") (emphasis added).)

Minute Key argues that the Court should enter judgment as a matter of law because

Hillman failed to produce clear and convincing evidence of bad faith. Hillman also failed to

produce, by a simple preponderance, evidence that the challenged statement was "literally false"

or was "commercial advertising or promotion." Likewise, the evidence does not support a

potential alternative finding that, even if Minute Key's statement was not "literally false,"

Walmart nonetheless was misled and actually deceived, and, as a result, changed a purchasing

decision. Finally, Minute Key contends that Hillman failed to produce adequate evidence of

causation for the injury alleged and damages awarded. The Court will address each argument in

sequence.

---

[11] Proof of bad faith is not required by statute. Yet "adding a bad faith requirement to a § 43(a) claim in
th[is] context . . . give[s] effect both to the rights of patentees as protected by the patent laws under ordinary
circumstances, and to the salutary purposes of the Lanham Act to promote fair competition in the
marketplace." *Id.* at 1354.

**A.** **A Reasonable Jury Could Have Found, by Clear and Convincing Evidence, That Minute Key's Statement Was Made in Bad Faith.**

**1. The Statement**

On September 5, 2013, Minute Key CEO Randy Fagundo sent the following email to Walmart employees Anne Johnson (Director of Home Services) and Dan Hoelter (Senior Manager for Home Services):

> Per our conversation yesterday I wanted to confirm with you that will be sending Hillman a patent infringement notice next Tuesday when our patent, U.S. Patent NO. 8,532,809 is issued. More specifically, **It appears that The Hillman group's "FastKey" key-duplicating kiosk system infringes at least claims 1, 3, 5-7,9 11-12 and 17.of our patent.**
>
> MinuteKey has clearly been the innovator in introducing networks of self-service key-duplicating kiosks, and MinuteKey's contributions would not have been possible without the investment of significant amounts of both time and money by our shareholders, to invent and develop this technology. Our investment is only protected by our intellectual property, and thus we have no choice but to enforce our intellectual property against anyone who attempts to misappropriate it, such as by infringing our patent rights. The patent to be issued next Tuesday is only the tip of the iceberg of our intellectual property, and there are many more on the way. Our shareholders expect, and are entitled to, a meaningful return on their investments, and this can be achieved only if our intellectual property is enforced against imitators. It is flattering to be imitated by others, but it also is evidence of the significance of the contribution that MinuteKey's technology has made to the industry, and our technology must be protected.
>
> Not sure how Hillman will respond to the notice but wanted to give you a heads up as you roll out self service key duplicating kiosks into your stores. I have attached the notice of issuance and the claims allowed thus far. Please call if you have any additional questions or comments.

(PX-112 at PX-112-0001–0002 (emphasis added) (spacing and punctuation as in original).)

Copied on the email was Chris Lohmann, Minute Key's Senior Vice President of Sales and Marketing. Fagundo testified that Minute Key's patent attorney, Stephen Rudisill, drafted the email for him. (Trial Tr. 6-46:8–15, Doc. 222 at PageID 11916; *see* PX-3.)

## 2. The Jury Instructions Regarding Bad Faith[12]

The Federal Circuit's decision in *Zenith* governs the bad faith inquiry. *Zenith* holds that "[e]xactly what constitutes bad faith remains to be determined on a case by case basis. Obviously, **if the patentee knows that the patent is** invalid, unenforceable, or **not infringed**, yet represents to the marketplace that a competitor is infringing the patent, a **clear case** of bad faith representations is made out." 182 F.3d at 1354 (emphases added). Hence this Court instructed the jury:

> [I]f a patent holder knows that its patent is not infringed and yet represents to the market that a competitor is infringing its patent, then a clear case of bad faith is made out. If Hillman has proved by clear and convincing evidence that Minute Key knew that the '809 patent was not infringed by Hillman's FastKey kiosk and yet represented to Walmart that it was, then you may conclude that Minute Key acted in bad faith.

(Trial Tr. at 9-20:14–21, Doc. 238 at PageID 12338; Doc. 264-1 at PageID 13076.) A "clear case" instruction essentially collapses the objective and subjective components of bad faith[13] into one inquiry. However, the Court also instructed the jury that bad faith could be proved "through a different method, one that has both objective and subjective components." (Trial Tr. at 9-21:3–5, Doc. 238 at PageID 12339; Doc. 264-1 at PageID 13077.) Continuing:

> The objective component requires a showing by Hillman by clear and convincing evidence that Minute Key's infringement allegation to Walmart was objectively baseless. An allegation is objectively baseless if a reasonable company could not realistically expect to succeed in litigation on the merits of its infringement allegation. In other words, Minute Key must have made the infringement allegation to Walmart having no reasonable basis to believe that Hillman's FastKey kiosk could have infringed the '809 patent.
>
> Now, Bad Faith, Subjective Intent. If you find that Minute Key's infringement allegation to Walmart was objectively baseless, then you

---

[12] The Court provided to each juror a printed copy of the entire set of instructions read aloud. (Trial Tr. 9-2:3–16, Doc. 238 at PageID 12320.) Hillman attached that printed copy as Exhibit A to its memorandum in opposition to Minute Key's Motion. (*See* Doc. 264-1 at PageID 13048–90.)

[13] *See Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 897 (Fed. Cir. 1998).

may continue to the second component of bad faith, one that allows you to consider subjective intent. This second component, like the first, also must be established by clear and convincing evidence. In this regard, you may consider evidence of Minute Key's motivation, including whether its allegation of patent infringement by Hillman was an attempt to interfere with Hillman's business relationship with Walmart.

(Trial Tr. at 9-21:5–23, Doc. 238 at PageID 12339; Doc. 264-1 at PageID 13077.) Neither

Minute Key nor Hillman objected to the "Clear Case"[14] or the "Objective

Baselessness/Subjective Intent"[15] jury instructions at the charge conference.

Regarding patent infringement generally, the Court instructed the jury as follows:

I instruct you that patent infringement is assessed on a claim-by-claim basis. The claim elements within a patent are often analogized to the metes and bounds of a property deed. The claim elements of a patent serve to outline and describe the scope of the invention that the patent protects. A patent cannot be infringed if even a single claim element is missing in an accused infringing product.

**The parties dispute whether the patent claims at issue here require a, quote, "fully automatic," unquote, kiosk in order for the '809 patent to be infringed.**

The scope of a claim element of a patent and its meaning is a question of law for me. In the case of the '809 patent, I instruct you to give the claim [element] "fully automatic" its plain meaning.

(Trial Tr. at 9-19:23–9-20:12, Doc. 238 at PageID 12337–38 (emphasis added); Doc. 264-1 at

PageID 13075 (emphasis added).) The second paragraph of this instruction, emphasized above,

was proposed by Minute Key at the charge conference as a substitute for the sentence, "Each

'claim' element of the '809 patent, all of which require a 'fully-automatic' kiosk, would have to

be found in Hillman's FastKey kiosk—the 'accused' infringing product—in order for the '809

patent to be infringed." (Trial Tr. at 8-18:10–8-24:23, Doc. 231 at PageID 12279–85; Doc. 267

---

[14] Trial Tr. at 8-24:24–8-25:1, Doc. 231 at PageID 12285–86.
[15] Trial Tr. at 8-25:2–7, Doc. 231 at PageID 12286.

at PageID 13487.)  Hillman objected.  (Trial Tr. at 8-24:19–20, Doc. 231 at PageID 12285

("Your Honor, we object.  We think your instruction as written is the correct one.").)

Finally, all three of these instructions were preceded by an introductory one:

As you have heard during the trial, this case originally began as a patent
case.  Hillman filed a lawsuit asking this Court to declare that its FastKey
kiosk did not infringe the '809 patent belonging to Minute Key.  Minute
Key responded by filing a counterclaim asking the Court to declare that
the FastKey kiosk did infringe its '809 patent.  Eventually both of those
claims were dismissed, and what remains for your deliberations are only
Hillman's federal and state claims of false advertising against Minute Key.
In this case, therefore, **you are not being asked to decide whether
Hillman's FastKey kiosk infringed the '809 patent. Rather, you are
being asked to decide whether the infringement allegations made by
Minute Key to Walmart were made in bad faith.**

A patent holder is permitted under the law to make statements
about its patent rights and about infringers that are true.  A patent holder is
even allowed to make representations that turn out to be false or
misleading as long as the representations are not made in bad faith.

 (Trial Tr. 9-19:4–21, Doc. 238 at PageID 12337 (emphasis added).)  Neither party objected to

this instruction.  (Trial Tr. 8-17:15–8-18:9, Doc. 231 at PageID 12278–79.)

### 3. Minute Key's Repackaged Arguments Regarding Claim Construction Fail

For the jury to find a clear case of bad faith, Minute Key contends that "the jury first

must have conducted its own claim construction in Hillman's favor and, then, simply compared

the kiosks to each other."  (Doc. 255 at PageID 12696–97.)  This was error, it believes, for two

reasons.  First, a jury cannot perform claim construction.  *See Markman*, *supra*, 517 U.S. at 372.

Second, product-to-product comparison is improper when analyzing infringement.  *Zenith Labs.*

*v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1423 (Fed. Cir. 1994).  Hillman responds that

"Minute Key's motion attempts to yet again re-litigate claim construction, consistent with

virtually every paper it has filed in this case since losing summary judgment."  (Doc. 264 at

PageID 13028.)  We agree with Hillman.  Minute Key's well-written reprise notwithstanding, the Court will not revisit this issue again.

The July 22, 2016 Order Denying Minute Key's Request for a Claim Construction of the '809 Patent informed the jury instructions.  Pretrial, this Court observed:  "Among other things, a jury will be asked to decide whether a reasonable litigant could have believed it would succeed on the infringement allegations made in 2013 by Minute Key to Walmart about Hillman.  That question can be answered **without construing** the plain language claim terms 'fully-automatic' and 'fully automatic' in the '809 Patent some three years after the allegations were made."  (Doc. 140 at PageID 7920 (emphasis added).)  At trial, the instructions were so tailored.  The jury was succinctly told what it was—and was not—being asked to decide.  It was told that it was *not* being asked to decide whether Hillman's FastKey kiosk actually infringed Minute Key's '809 patent.  It was told *instead* that it was being asked to decide whether Minute Key's infringement allegations about Hillman's FastKey kiosk made to Walmart in 2013 were made in bad faith.  To this end, and by way of background, the jury was instructed that a patent cannot be infringed if even a single *claim element* is missing from an accused infringing product; that the parties disputed whether the patent claims at issue required a "fully-automatic" kiosk in order for the '809 patent to be infringed; and that, in the case of the '809 patent, the *claim element* "fully automatic" should be given its plain meaning.  These instructions, considered together, allow a reasonable jury to conclude that a kiosk that is not "fully automatic"—based on that *claim element*'s plain meaning—cannot infringe Minute Key's '809 patent for purposes of a Lanham Act false advertising claim.

The parties devote considerable attention in their briefs to wordsmithing the charge conference.  On appeal, of course, the transcript will stand on its own.  Minute Key is absolutely

correct when it recounts that the Court did not engage in a claim construction. But Minute Key persistently ignores the reason why. The Court did not engage in a claim construction *because one was not needed*. The Court did not engage in a claim construction because the claim terms "fully-automatic" and "fully automatic" were not "technically complex" and had a "plain meaning" that a jury "c[ould] and w[ould] understand." (Doc. 140 at PageID 7919.) The jury was instructed, without objection from Minute Key, that it should "give the claim [element] 'fully automatic' its plain meaning." The sentence the Court allowed Minute Key to substitute—the one concerning the parties "dispute" about whether the patent claims require a "fully-automatic" kiosk in order for the '809 patent to be infringed—does not, as Minute Key insists, convert the jury's deliberation into a claim construction.

### 4. Minute Key's Marketing Documents

In Minute Key's view, any evidence contained in its marketing documents is "legally irrelevant" to the reasonableness of its allegation to Walmart. (Doc. 255 at PageID 12698–99.) Hillman correctly recalls that Minute Key made a nearly identical argument during summary judgment that the Court rejected. (*See* Doc. 136 at PageID 7824–26 (declining to apply *iLOR*'s holding that a blog entry was irrelevant to the issue of objective baselessness, *see* 631 F.3d at 1380, because here, in contrast to *iLOR*, marketplace representation is the heart of the cause of action).) As it did on the question of claim construction, the Court declines to reexamine this issue. Further, this Court did not then—and does not now—rule that "[m]arketing documents may be considered as part of the subjective component of bad faith only **after** an objective analysis is conducted." (Doc. 267 at PageID 13491 (emphasis in original) (citing *800 Adept, Inc. v. Murex Sec., Ltd.*, 539 F.3d 1354, 1370–71 (Fed. Cir. 2008).)

**5.  The Evidence at Trial Regarding Bad Faith**

Mindful of the applicable "clear and convincing" standard of proof, the Court determines that a reasonable jury could have returned a verdict in Hillman's favor under the *Zenith* analysis.

In support of the jury's verdict that Minute Key "knew" that the '809 patent was not infringed by Hillman's FastKey kiosk and yet represented to Walmart that it was—a "clear case" of bad faith—Hillman underscores the following evidence:

> Minute Key prepared an internal spreadsheet comparing its kiosk to FastKey, which Fagundo sent to Lohmann on January 3, 2013.  (PX-57.) Next to a line item marked "Fully Automated" was an "X" for Hillman and a "√" for Minute Key.  (*Id.* at PX-57-0002.)  This distinction was labeled as being of "High" importance.  (*Id.*)

> On January 16, 2013, the day after Fagundo told Minute Key board member and investor Kevin Frick that he was "[t]hinking about raising the patent card" with Walmart (*see* PX-106 at PX-106-0002–0003), Lohman sent to Walmart's Christy Rains a "Business Summary" stating that Minute Key's kiosk was the "**first and only** fully automated, self-service key duplication machine."  (PX-62 at PX-62-0002 (emphasis added).) This assertion appeared one line below another statement that Minute Key's only "current competition" was "Fast Key."  (*Id.*)

> One week later, during a meeting with Walmart on January 24, 2013, Minute Key presented a chart titled "Competition" with a field for "Customer Experience."  (PX-36 at PX-36-0001, PX-36-0016.)  Next to the line item "Fully Automated," an entry of "No – 'Make your own key'" appeared for FastKey and "Yes – 'We copy your key'" for Minute Key. (*Id.* at PX-36-0016.)

> At trial, Fagundo conceded that terms "fully automated" (appearing in marketing documents) and "fully automatic" (appearing as a claim in the '809 patent) were "synonymous."  (Trial Tr. at 6-171:5–8, Doc. 224 at PageID 11995.)

Minute Key claims the evidence shows only that its actions constituted "reasonable commercial behavior" because it "engaged a patent attorney to conduct an infringement analysis prior to informing Walmart about potential infringement, and continued to engage this same attorney to create the claim chart requested by Walmart, which yielded the 'blank' or 'zero'

entries in the chart next to the preamble to the claims that embody the parties' claim construction dispute." (Doc. 255 at PageID 12698 (citing Trial Tr. at 6-38:7–11, 6-39:3–6-40:6, 6-45:25–6-47:13, 6-186:20–22, Doc. 222 at PageID 11908–10, 11915–17; Doc. 224 at PageID 12010).) Fagundo admitted, however, that he never provided any of the marketing documents to attorney Rudisill. (Trial Tr. at 6-45:19–24 ("No. I think I was paying them enough for the patent review not to review the marketing documents."), Doc. 222 at PageID 11915.) In order "to obtain a clear understanding of Minute Key's allegations" via "an identification of the specific parts or components of the Hillman equipment that Minute Key believes infringes and the specific claims Minute Key alleges are being infringed," Walmart Associate General Counsel Rosalyn Mitchell asked Rudisill to prepare a claim chart.

(PX-3 at PX-3-0002.) Rudisill complied, and this chart comparing FastKey to the claims of the '809 patent was shown to the jury. (*Id.* at PX-3-0005, PX-3-0007.) Notably, the field next to the first claim, "A network of self-service, fully-automatic kiosks for duplicating keys, said network comprising[,]" was left blank, as was the field next to the claim numbered 15, "A method of duplicating keys in a network of self-service, fully automatic kiosks at different locations, each having[.]" (*Id.*) The absent patent attorney in this case, whom Minute Key curiously did not bring to trial, cannot save Minute Key on the question of bad faith.

To its credit, Minute Key grudgingly concedes that "the record evidence could demonstrate at most only the subjective component of bad faith, even in a 'clear case' analysis." (Doc. 255 at PageID 12700.) Indeed, it could:

> Setting the stage, and after learning in April 2012 that it would be required to compete against Hillman in the form of a 100-store to 100-store, head-to-head pilot to secure future Walmart business, Minute Key board member and investor Frick asked CEO Fagundo "if there is any way we can use the patent application to create some FUD with Walmart re Hillman." (PX-82 at PX-82-0001–0002.) Fagundo testified at trial that

16

"FUD" is an acronym for "fear, uncertainty, and doubt." (Trial Tr. at 6-100:20–6-101:6, Doc. 220 at PageID 11837–38.)

Having learned in December 2012 that it had lost the head-to-head pilot against Hillman, on January 15, 2013 Fagundo sent an email to Frick stating that he was "[t]hinking about raising the patent card." (PX-106 at PX-106-0002–0003.) The subject of patents had not been discussed during at least the two prior business meetings between Minute Key and Walmart. (Trial Tr. at 6-138:25–6-141:23, Doc. 224 at PageID 11962–65; *see* PX-28 (September 6, 2012 deck), PX-29 (November 12, 2012 deck).)

When communicating with each other about Hillman, Minute Key employees were viscerally malevolent. In an email string beginning January 9, 2013 at 9:24 p.m. and ending the following morning at 2:31 a.m., these remarks were exchanged: "Fuck Hillman, they don't know they are messing with a pirate." (from Fagundo); "Ha…love it. Always need a competitor and we will whack them in time[;]" and "Need to whack them now!" (from Fagundo). (PX-105 at PX-105-0001.) And later, after this civil action commenced, "I'm pissed. I don't want to win at the kiosk level – I really want to hurt them – badly." (Lohmann to Fagundo); and "We are and will continue. If we were not they would not be fucking with us. Go to bed please;)" (Fagundo to Lohmann at 4:04 a.m.). (PX-69 at PX-69-0001.)

Finally, Minute Key's remarks surrounding the patent infringement allegation were glib. Fagundo forwarded his email to Walmart's Johnson and Hoelter to Minute Key's "Leadership" the same day with the message, "FYI. Let the fun begin." (PX-113 at PX-113-0001.) Upon receipt of the "freeze" letter from Walmart's Hoelter, *see* Part III.C, *infra*, Fagundo tells board members, "Interesting developments at WalMart. They appear to taking the patent infringement letter very seriously[.] . . . It's getting exciting!" (PX-114 at PX-114-0001–0003.) And, after signing a contract for new business in March 2014, Fagundo remarks to board members "I think we finally won this one." (PX-116 at PX-116-0003–0004.)

Because the record contains sufficient evidence, without a doubt clear and convincing evidence, upon which a jury properly could find bad faith as a matter of law, in this regard Minute Key's Motion must be denied.

## B. A Reasonable Jury Could Have Found Minute Key's Statement Was Literally False.

The Court also rejects Minute Key's second ground in support of its Motion, lack of "legally relevant evidence" in support of literal falsity. (*See* Doc. 255 at PageID 12701.) In

Minute Key's view, "To find for Hillman, the jury had to agree with Hillman that 'fully automatic' is a claim limitation. That required the jury to construe the claims. But the jury could not do so as a matter of law." (*Id.* at PageID 12703.) This Court already has ruled, however, that a claim construction was not necessary in order for Hillman to litigate its false advertising causes of action against Minute Key. That ruling stands.

So, too, does this Court's ruling on summary judgment that the phrase "it appears" is sufficient as a matter of law. While only an "unambiguous" message can be literally false, *Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 737 (6th Cir. 2012) (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*, 290 F.3d 578, 587 (3d Cir. 2002)), the message—or statement—must be interpreted in context.[16] (*See* Doc. 136 at PageID 7819.) And the jury was so instructed: "To determine whether a challenged statement is one of fact or [of] opinion, the statement must be evaluated within the context in which it was made."[17] (Trial Tr. at 9-17:8–10, Doc. 238 at PageID 12335; Doc. 264-1 at PageID 13070.) Fagundo's September 5, 2013 email to Johnson and Hoelter, *examined as a whole*,[18] is

---

[16] *Podiatric Physicians*, 185 F.3d at 615 ("[T]he statement *in context* is more a statement of opinion than a statement of fact.") (emphasis added); *Champion Labs., Inc. v. Parker-Hannifin Corp.*, 616 F. Supp. 2d 684, 695 (E.D. Mich. 2009) ("To decide whether the statements [a]re statements of fact or opinion, the Court must evaluate the statements *within context.*") (citing *Podiatric Physicians*, emphasis added).

[17] Neither Minute Key nor Hillman objected to this instruction. (Trial Tr. at 8-4:15–18, Doc. 231 at PageID 12265.)

[18] Notable excerpts include: (1) Minute Key "will be sending Hillman a patent infringement notice next Tuesday when our patent, U.S. Patent NO. 8,532,809 is issued[;]" (2) Minute Key has "no choice but to enforce our intellectual property against anyone who attempts to misappropriate it, such as by infringing our patent rights[;]" (3) "Our shareholders expect, and are entitled to, a meaningful return on their investments, and this can be achieved only if our intellectual property is enforced against imitators[;]" and (4) "[O]ur technology must be protected." (PX-112 at PX-112-0001.) Fagundo also attached to his email the "Issue Notification" for the '809 patent as well as the "Allowed Claims" to date. (*See id.* at PX-112-0002.)

not equivocal in nature, and the jury reasonably could read it to state the fact that Hillman is a patent infringer.

**C.** **A Reasonable Jury Could Have Found, Alternatively, that Walmart Was Actually Deceived and that the Deception Influenced Walmart's Purchasing Decisions.**

Under the Lanham Act, deception is presumed if there is a finding that a statement was "literally false." *See Innovation Ventures*, 694 F.3d at 735. But if a statement is "literally true yet deceptive or too ambiguous to support a finding of literal falsity, a violation can only be established by proof of actual deception." *Id.* The jury was so instructed:

> If you determine that any statement by Minute Key about Hillman's FastKey kiosk to Walmart was literally false, then you may presume that Walmart was deceived with respect to that particular statement. **However, if you determine that the statement was true but misleading, you must determine whether Hillman has proved that Walmart was actually deceived.**

(Trial Tr. at 9-18:14–20, Doc. 238 at PageID 12336 (emphasis added).)[19] Had the Court ruled that the jury's finding of literal falsity could not withstand challenge, Minute Key argues that the evidence would not support an alternative finding of actual deception and materiality. (Doc. 255 at PageID 12707–08.) The Court rejects this contention.

Citing *Podiatric Physicians*, Minute Key urges that Hillman did not satisfy its burden to produce "direct evidence" that Walmart was actually deceived by Minute Key's September 5, 2013 email. 185 F.3d at 613–14, 616–18. In this regard, Minute Key refers largely to the testimony of Dan Hoelter, Walmart's Senior Manager for Home Services, whose videotaped deposition was played for the jury.[20] He denied that Minute Key's allegation of patent infringement "brought everything to a halt." (Doc. 116 at PageID 3262 (113:4–8); *see also id.* at PageID 3256 (88:9–14).) Rather, "it was considered that Hillman was going to file a countersuit,

---

[19] Neither Minute Key nor Hillman objected to this instruction. (Trial Tr. 8-17:10–12, Doc. 231 at PageID 12278.)
[20] Trial Tr. 4-110:20–21, Doc. 213 at PageID 11547; Trial Tr. at 4-113:10–11, Doc. 212 at PageID 11484.

which then complicated things." (*Id.* at PageID 3262 (113:4–17).)  Hoelter stated that as of September 12, 2013, a week after receiving Fagundo's September 5 email alleging infringement, "there was no change in any sort of rollout schedule.  Everything was business as usual." (*Id.* at PageID 3251 (67:1–13).)  Regarding materiality, Minute Key insists that Hillman did not prove—indeed, could not prove—that Walmart changed its purchasing decision because Hillman eventually installed the 1,000 kiosks it was awarded as a result of winning the pilot.  (Trial Tr. at 2-129:1–16, Doc. 204 at PageID 11074.)

Hillman counters that, with respect to actual deception, *Podiatric Physicians* merely requires a showing of evidence that the consumer "perceived the advertisement in a way that misled [it] about the plaintiff's product."  185 F.3d at 614.  The excerpts of Hoelter's testimony cited by Minute Key fail to account for the directive he sent within 24 hours of receiving Minute Key's September 5 email:  "Due to the upcoming issuance of the MinuteKey Patent that will occur on Tuesday and the cease order that will be issued to the Hillman Group (FastKey) we will be using the MinuteKey Program for all stores asking for the self-assisted key cutting kiosk." (JX-2024 at JX-2024-0002.)  Additionally, Walmart Associate General Counsel Rosalyn Mitchell required Hillman to confirm its indemnification obligations within days of Minute Key's September 5, 2013 email.  (JX-2020.)  Hillman General Counsel Douglas Roberts testified that Walmart's request in this respect was redundant inasmuch as "[t]here was already indemnification from Hillman in the kiosk license agreement" and a reflection of how "nervous" Walmart was about Minute Key's allegations.  (Trial Tr. at 5-45:2–5-46:1, Doc. 215 at PageID 11594–95.)  As for materiality, Hillman maintains that it was not required to prove that Walmart *changed* a purchasing decision.  All that is necessary under *Podiatric Physicians* is proof that "the statement is material in that it **will likely influence** the deceived consumer's purchasing

decisions."  185 F.3d at 613 (emphasis added).  Hoelter's day-after email sufficiently

demonstrates this likelihood.  (*See* JX-2024 at JX-2024-0002.)  Moreover, evidence was

presented to the jury suggesting that the original purchasing decision *was* changed.  Hoelter's

letter to Hillman initiating the rollout freeze specifically pinpointed Minute Key's allegations as

the catalyst:

> As I believe you are aware, Walmart has non-exclusive written
> agreements with both The Hillman Group, Inc. and Minute Key, Inc. for
> key duplication services in Walmart stores.  Pursuant to those agreements,
> Hillman and Minute Key have deployed their respective key duplication
> machines in different Walmart stores.  Walmart has been in the process of
> working with both Hillman and Minute Key to deploy additional Hillman
> and Minute Key machines in various other Walmart stores that currently
> do not have key duplication machines.
>
> **As you know, Minute Key has recently alleged that the Hillman key
> duplication machines infringe a patent that was issued on September
> 10, 2013 to Minute Key.**  To date, no lawsuit has been filed by either
> Hillman or Minute Key regarding the claims of infringement.  Walmart is
> not in a position to determine the validity of the Minute Key patent or the
> merits of Minute Key's allegations of infringement.  Walmart understands
> that Hillman and Minute Key are addressing these claims directly with
> each other.
>
> **At this time, Walmart is suspending the deployment of key
> duplication machines that are supplied by both Minute Key and
> Hillman.**  Effective immediately, please stop efforts to place key
> duplication machines in Walmart stores.  Walmart will not accept any new
> key duplication machines in its stores until further notice.  We are
> providing similar notice to Minute Key.

(JX-2028 at JX-2028-0002 (emphasis added).)  Delaying Hillman's exercise of a contractual

right in the time period immediately prior to Walmart's holiday blackout[21]—and denying

---

[21] "Holiday" is Walmart's "biggest" season.  (Doc. 116 at PageID 3252 (73:14–15).)  Accordingly, "any
third party who is trying to set new kiosks" is subject to "a blackout period from October 15th through
January 15th for holiday."  (*Id.* at PageID 3252 (72:13–73:11).)  That way, according to Hoelter, "nobody
can be in the stores taking away from our associates' focus to helping our customers shop."  (*Id.* at PageID
3252 (73:2–15).)

Hillman (as well as its customer, Walmart) the revenue expected during that time period—qualifies as a "change" to the original purchasing decision. (*See* Doc. 264 at PageID 13042.)

The Court agrees with Hillman that the record evidence would have allowed a reasonable jury to find actual deception and materiality if it had not returned a finding of literal falsity. While Walmart's Hoelter may have been a disinterested witness, his after-the-fact testimony that it was *Hillman's* actions that caused the "freeze" on FastKey installs was inconsistent with emails sent in the immediate wake of Minute Key's allegation of patent infringement. And with respect to any award of stores beyond the initial 1,000, his testimony was equivocal, and dramatically so. Explaining what he meant when writing, "We are aligned that MK get first call since you are our main provider going forward[,]" Hoelter answered:

> Well, seeing as that FastKey was capped at 1,000 stores due to legal issues, and that would automatically mean that minuteKEY, the other provider, would be our main provider going forward.

(Doc. 116 at PageID 3276 (166:10–18).) After a ten-minute break in testimony, Hoelter indicated there was "something" he wanted to clarify:

> My last statement before we left – it's a long day, and I said that minuteKEY became the main provider moving forward because of legal actions, which actually that's not the case. It was based off of the data analysis that I did back in July.

(*Id.* at PageID 3276 (167:13–22).) In this circumsance, a reasonable jury, charged with the responsibility to assess the credibility of *every* witness, could have concluded that Hoelter's contemporaneous documents reflected the truth of Walmart's actions vis-à-vis the rollout freeze. On this alternative ground, then, were it necessary to consider, the Court would deny Minute Key's Motion.

**D. A Reasonable Jury Could Have Found Minute Key's Statement Was Made in Commercial Advertising or Promotion.**

Only statements made in "commercial advertising or promotion" fall within the scope of the Lanham Act. 15 U.S.C. § 1125(a)(1)(B). As noted at summary judgment, in *Grubbs v. Sheakley Grp., Inc.*, the Sixth Circuit recently considered "the reach of the Lanham Act with respect to false advertising claims." 807 F.3d 785, 799 (6th Cir. 2015). For a statement of fact to be actionable as unfair competition, it must constitute "commercial speech" made "for the purpose of influencing customers to buy the defendant's goods or services" that is disseminated either widely enough "to the relevant purchasing public" or "to a substantial portion of the plaintiff's or defendant's **existing** customer or client **base**." *Id.* at 801 (emphasis added). Following *Grubbs*, this Court resolved that the proper customer "base" should be tied to the market for self-service key duplication kiosks and not key duplication equipment generally. (Doc. 136 at PageID 7823.) Statements to a single customer can trigger the protections of the Lanham Act "if the market at issue is very small and discrete," *see Champion Labs.*, 616 F. at 694–95, but it was for the jury to decide whether the market at issue in this civil action was properly limited to Walmart. (Doc. 136 at PageID 7824.)

Minute Key contends that the evidence at trial showed that the "base" from which Hillman looked to draw its customers for the FastKey as of September 2013 extended "far beyond Walmart to several other mass retailers." (Doc. 255 at PageID 12705–06.) Even crediting testimony as to Hillman's business model of placing its FastKey "only where it could implement a 'two-system solution,'" there was evidence that its "base" extended—beyond Walmart—at least to Home Depot, Lowe's, Orchard Supply, Meijer, and Menards. (*Id.* at PageID 12706 (citing Trial Tr. at 2-207:12–2-214:7 (Menards, Orchard Supply), 2-215:10–2-216:14 (Orchard Supply), 2-218:16–2-221:12 (Lowe's), 2-226:18–227:3 (Meijer), 2-229:1–2-

231:18 (Menards), Doc. 205 at PageID 11152–59, 11160–61, 11163–66, 11171–72, 11174–76; DX-1098, DX-1099, DX-1108, DX-1105, DX-1111).)  Because Walmart "was only one customer within a much larger customer base for Hillman," Minute Key contends it is entitled to judgment as a matter of law on the issue of dissemination.  (*Id.* at PageID 12706.)

Hillman responds that Minute Key's argument effectively removes the word "existing" from the *Grubbs* decision, citing testimony from Hillman employees Gary Seeds, Senior Vice President of Sales, and Cindi Yancey, Walmart Account Manager, "that virtually every FastKey ever built was and has always been in Walmart stores."  (Doc. 264 at PageID 13038.)  Seeds testified that, out of "a thousand and twenty" FastKeys ever built, "a thousand" were in Walmart stores.  (Trial Tr. at 3-95:11–17, Doc. 210 at PageID 11400.)  Yancey, whose videotaped deposition was played for the jury,[22] confirmed.  When asked how many FastKeys were operating in stores other than Walmart, she testified, "I'm going to say maybe 20."  (Doc. 114 at PageID 3071 (46:4–7).)  Seeds further testified that the FastKey kiosk was designed for Walmart, and that Walmart was "100 percent of [Hillman's] focus" for self-service key duplication.  (Trial Tr. at 2-19:3–19, Doc. 203 at PageID 11016.)

Hillman correctly notes that *Grubbs* refers to an "existing" customer base, and not a *potential*, *possible*, or even *once-contemplated* customer base.  The May 19, 2011 "Production Plan" introduced into evidence as DX-1098 lists retailers *other than* Walmart, but the jury heard Seeds testify that no retailers *besides* Walmart invited a 100-store to 100-store, head-to-head competition—FastKey versus minuteKey—between Hillman and Minute Key.  (*Id.* at 2-172:15–2-173:12, Doc. 204 at PageID 11117–18.)  On this evidence, a reasonable jury could decide that

---

[22] Trial Tr. at 6-240:5–6-241:3, Doc. 225 at PageID 12064–65; Trial Tr. at 7-2:3–7-3:25, Doc. 228 at PageID 12138–39.

Minute Key's statement of infringement on September 5, 2013 was disseminated to a "substantial portion" of Hillman's "existing" customer base as *Grubbs* requires.

### E. <u>A Reasonable Jury Could Have Found Hillman Proved Causation and Harm.</u>

Minute Key urges that no reasonable jury could have found that its infringement statement caused injury to Hillman in the form of a delay in its pilot rollout.  As it asserted in connection with its alternative actual deception and materiality arguments, Minute Key claims that "Hillman's own actions and Walmart's independent decisions stand uncontradicted" and therefore "undercut" any causal link.  (Doc. 255 at PageID 12709.)   Minute Key also contends that the jury's award "was based on nothing other than speculation" and hence "cannot stand." (*Id.* at PageID 12710.)

Hillman replies that Minute Key's arguments should be rejected outright because they were not raised in either of Minute Key's motions made under Rule 50(a)(2) during trial.  (Doc. 264 at PageID 13043.)  Not so.  Hillman is correct that a Rule 50(b) motion "is only a renewal of the preverdict motion" and, as such, "can be granted only on grounds advanced in the preverdict motion."  *See Ford v. Cnty. of Grand Traverse*, 535 F.3d 483, 491 (6th Cir. 2008) (quoting advisory committee's note (2006 Amendment)).  Hillman is similarly correct that if a ground is not raised in a "sufficiently substantial way in the earlier motion," it is not preserved for a Rule 50(b) motion after the verdict.  *CFE Racing Prods., Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 583 (6th Cir. 2015).   But during argument at the close of Hillman's case-in-chief, Minute Key's counsel explained that the concepts of "actual deception," "material[ity]," and "purchasing decision" changes are all "tied into causation."  (Trial Tr. at 5-232:22–5-233:4, Doc. 218 at PageID 11781–82.)  This argument continued for some three pages of the transcript.  (*Id.* at 5-

232:22–5-235:20, Doc. 218 at PageID 11781–84.)[23]  Counsel later addressed the lack of

evidence of damages for any delay in the rollout during argument at the close of all evidence.

(Trial Tr. at 8-33:25–8-34:24, Doc. 234 at PageID 12299–12300.)  Having sufficiently preserved

these arguments, Minute Key is entitled to a ruling on their substance.

As discussed in Part III.C, *supra*, the "freeze" letter sent to both Hillman and Minute Key

over Dan Hoelter's signature supports the jury's verdict in favor of Hillman in terms of

causation.  (*See* JX-2028.)  Hoelter testified that the letter "was drafted with the help of

[Walmart's] legal team[,]" having determined "it [   ] would be best for Walmart's perspective to

suspend all operations **until we could actually dig into the issue further so that we weren't**

**knowingly infringing on any patents by allowing FastKey to install.**"  (Doc. 116 at PageID

3253 (76:16–77:7) (emphasis added).)

Certified Public Accountant Matthew L. Gutzwiller testified that Hillman suffered lost

profits in the amount of $328,144 as a result of the rollout freeze.  (Trial Tr. at 5-144:19–5-

146:3, Doc. 217 at PageID 11693–95; Trial Tr. at 5-149:8–5-155:6, Doc. 217 at PageID 11698–

704; PX-245, JX-2053.)  In calculating lost profits, Gutzwiller assumed that "the 303 machines

that ultimately were subject to the rollout freeze would have been deployed and generating

revenue as early as October 31st, 2013."  (Trial Tr. at 5-145:19–5-146:2, Doc. 217 at PageID

11694.)  Gutzwiller assumed that Hillman could install 303 machines in five weeks—

approximately 60 per week—based on a review of Hillman's installation pace in September

2013 immediately before the freeze.  (*Id.* at 5-192:12–24, Doc. 217 at PageID 11741 ("I actually

looked at it by week, and there are two weeks in September, one they did 74 machines and

another week they did 65.  So I think my assumption that they could do 60 a week I believe was

---

[23] Counsel's statement—"There is absolutely no evidence of causation."—was a *concluding* sentence, and
not, as Hillman suggests, a conclusory one.

reasonable, yes.").)  But Gutzwiller's calculation admittedly did not account for Walmart's holiday blackout that began in mid-October.  (*Id.* at 5-192:4–11, Doc. 217 at PageID 11741 ("[T]he information that I had suggested that [the Walmart annual blackout] would not have been imposed until perhaps the middle of November which would have accommodated that installation of these 303 machines.  So I think the answer to your question is that's correct, I didn't factor in the blackout here.").)[24]

    The jury awarded Hillman $164,072.[25]  That amount obviously is one-half of the lost profits Gutzwiller calculated.  That amount gives every indication of adjusting a five-week period (September 27 – October 31) down to a two-and-one-half week period (September 27 – October 15).  While the Court cannot be certain, it seems that the jury applied basic arithmetic skills and—to account for the beginning of Walmart's holiday blackout—divided by two. Nothing is speculative about the jury's verdict in light of the testimony, and the Court will not disturb it.

## IV.    CONCLUSION

    For all the foregoing reasons, Defendant Minute Key Inc.'s Renewed Motion for Judgment as a Matter of Law is hereby **DENIED**.

        **IT IS SO ORDERED**.

Dated:  March 28, 2018        S/Susan J. Dlott_____
                             Judge Susan J. Dlott
                             United States District Court

---

[24] Hoelter established that blackout for Holiday 2013 began on October 15, but noted "the prior year it was the 31st."  (Doc. 116 at PageID 3252 (72:20–25).)  This testimony is consistent with that of Hillman's witnesses who recalled that the typical blackout period began at the end of October.  (*See, e.g.*, Trial Tr. at 4-122:11–19, Doc. 212 at PageID 11493 (Per General Counsel Roberts, "October 15th, which is at least two weeks earlier than, you know, a typical blackout period, the holiday blackout period that we've discussed before, you know, would have occurred.").)

[25] Verdict Form, Doc. 240 at PageID 12466.